**Janice WINNINGHAM, on behalf of herself and all others similarly situated, Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Defendants.**

**Civ. A. No. 3237.**

United States District Court, S. D. Georgia, Savannah Division.

Feb. 19, 1974.

David Walbert, Atlanta Ga., Elizabeth M. Youngerman, Savannah, Ga., Ga. Indigents Legal Services, Inc., for plaintiffs.

Lamar C. Walter, Asst. U. S. Atty., Savannah, Ga., Raymond C. Buday, Jr., Asst. Regional Counsel, Atlanta, Ga., for H. U. D.

William H. Pinson, Jr., Savannah, Ga., for Abbitt Realty and Dorothy Atkinson.

## ORDER

LAWRENCE, Chief Judge.

### I. *Background*

Mrs. Janice Winningham and four of her five children occupy an apartment in Presidential Plaza at Savannah, a section 236 housing project. That section is part of the Housing and Urban Development Act of 1968 which establishes a program of private rental housing for designated classes of lower income individuals and families.

Plaintiff seeks a declaration by this Court that a portion of the 1968 legislation and appurtenant Regulations [1] violate the Fifth Amendment in limiting eligibility for "rent supplement" to tenants "occupying substandard housing". The defendants are the Department of Housing and Urban Development; the Secretary of HUD; the Southeastern Regional Administrator, and the Manager and resident manager of the Project.

Since plaintiff has never resided in substandard housing, she is unqualified to receive supplemental rent assistance under the language of the Act. As the law is written, if Mrs. Winningham had left substandard housing and moved into Presidential Plaza, she would be entitled under the law to a substantial rent supplement.[2] Because of a recent change in her financial status, she is now unable to pay the "basic rental" stipulated in the lease. She claims that as a result she will be forced to leave standard housing and move into substandard housing. Plaintiff is not qualified to receive rent assistance even though she might have the identical income and family size as an eligible tenant occupying substandard housing.

Mrs. Winningham contends that the statute and Regulation as applied to her and to others similarly situated denies equal protection under the Fifth Amendment. She asks for a declaratory judgment that "12 U.S.C. § 1701s(c)(2) [is] unconstitutional insofar as it precludes tenants who are financially eligible from receiving rent supplement, even though they may have to move from a project because they cannot pay the Basic Rent, or even though they must suffer substantial deprivations to pay the Basic Rent."

### II. *Jurisdiction*

Jurisdiction of this Court is predicated on various federal statutes, namely:

(a) Cases arising out of the Constitution or laws of the United States where the matter in controversy exceeds $10,000 (28 U.S.C. § 1331); (b) actions arising out of acts of Congress regulating commerce (28 U.S.C. § 1336); (c) right of review under the Federal Administrative Procedure Act by a person aggrieved by agency action (5 U.S.C. § 702); (d) actions in the nature of mandamus to compel an officer or employee of the United States or agency thereof to perform a duty owed to plaintiff (28 U.S.C. § 1361).

The jurisdictional basis of this case gives some trouble. Clearly it does not arise out of any act of Congress regulating commerce. Further, the $10,000 jurisdictional requirement would appear to be lacking for a § 1331 action arising under the Constitution and laws of the United States. The difference between the rent, with and without the supplement, is $1104.00 annually. On this basis, future annual rentals, reduced to present value, would have to be

---

1. See 12 U.S.C. § 1701s(c)(2)(D); 24 C.F.R. § 215.20(4)(iv).

2. Mrs. Winningham pays "basic rent" of $116.46 per month. Beginning February 1st, the rental will be $129. A tenant having the same income as plaintiff and moving into Presidential Plaza from substandard housing would pay only $37.00 per month for the same unit by virtue of the rent supplement to which the qualified class of tenants is entitled under the statute.

paid for over ten years to meet the jurisdictional requirement. In the analogous case of insurance disability benefits becoming due in the future it has been held that same are not includible in computing the amount in controversy. See Carroll v. Mutual of Omaha Insurance Company, 354 F.Supp. 1260 (W.D. Va.); Marcus Brown Holding Co. v. Pollak, 272 F. 137 (S.D.N.Y.). The existence of the class feature of the litigation does not change things. Damage sustained by unidentified members of the class must meet in each individual instance the jurisdictional requirements. Zahn et al. v. International Paper Company, 414 U.S. 291, 94 S.Ct. 505, 38 L. Ed.2d 511; Snyder v. Harris et al., 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319.

■ Under the Administrative Procedure Act, a person suffering legal wrong or aggrieved by agency action is entitled to judicial review. 5 U.S.C. § 702. There is no provision for administrative review in the statute or regulations. In fact, no formal agency action or ruling has been taken or made by HUD unless its adherence to the terms of the Rent Supplement legislation amounts to such. The federal courts have dealt rather liberally with § 702. "While the cases dealing with nonreviewability are admittedly conflicting, the later trend favors judicial review." The School Board of Okaloosa County et al. v. Richardson et al., 332 F.Supp. 1263, 1268 (N.D.Fla.); Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681.

■ The likeliest ground of jurisdiction in the instant case appears to be 28 U.S.C. § 1361 which confers same in the case of actions in the nature of mandamus brought against officers of the United States to compel performance of a duty owed to the plaintiff. Declaratory judgment, not a mandatory injunction, is sought here. If injunctive relief were still prayed, this would certainly seem to be an action in the nature of mandamus. I think it partakes of such even though only a declaration of legal rights is sought. Incidentally, the matter of compelling an officer or agency to exercise discretion in a particular manner is not involved here. HUD must abide by and carry out the statute as written. By the same token, should the legislation be unconstitutional and plaintiff held to be entitled to rent supplement, HUD officials would have no alternative other than to grant same to the particular tenant.

In Langevin v. Chenango Court, Inc. et al., 447 F.2d 296 (2nd Cir.) a declaratory judgment was sought to the effect that rent increases applicable to a section 221 housing project violates the due process rights of the plaintiff in the absence of a trial-type hearing. A temporary restraining order was also requested by plaintiff. The Second Circuit said (p. 300):

"The issue with respect to the jurisdiction of the district court has been eased by what we deem an appropriate concession by the Government that plaintiffs' claim of entitlement to a hearing before the FHA is an 'action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff,' 28 U.S.C. § 1361, which has no requirement of jurisdictional amount."

In Haines v. United States, 453 F.2d 233 (3rd Cir.) only declaratory relief was sought by a plaintiff who attacked the validity of his discharge from the Air Force under other than honorable conditions. The Court treated the suit as a § 1361 action in the nature of a mandamus. See also Carter v. Seamans, 411 F.2d 767, 772–773 (5th Cir.). "The purpose of the Mandamus and Venue Act of 1962 was to provide a convenient, local federal court for aggrieved persons, particularly those wanting judicial review of federal administrative action, to obtain mandamus against federal officials." 13 A.L.R.Fed. 153. See also Byse and Fiocca, "Section 1361 of the Mandamus and Venue Act of 1962 and 'Nonstatutory' Judicial Review of Federal Administrative Action", 81 Har.Law R. (Dec., 1967), pp. 308ff.

■ The existence of jurisdiction here is not clear. Judges have a tendency to find same where there is a semblance of statutory authority for its exercise and no other remedy is immediately open to a litigant claiming a deprivation of constitutional rights. Jurisdiction is the more readily accepted in this case since the Government has failed to raise any issue in that respect.

### III. *The Housing Legislation of 1968*

The Act of 1949 established a national goal of "a decent home and a suitable living environment for every American family." Such objective was reaffirmed in the Housing and Urban Development Act of 1968. 42 U.S.C. § 1441a; 12 U.S.C. § 1701t. The purpose of § 236 legislation was to encourage private enterprise to engage in the development of rental and cooperative housing for lower income families who "could not otherwise decently house themselves". The highest priority and emphasis was to be given to meeting the housing needs of those families for which the national goal has not become a reality. 12 U.S.C. § 1701t.

"For the purpose of reducing rentals for lower income families, the Secretary is authorized to make . . . periodic interest reduction payments on behalf of the owner of a rental housing project designed for occupancy by lower income families, which shall be accomplished through payments to mortgagees holding mortgages meeting the special requirements specified in this section." 12 U.S.C. § 1715z–1(a). Project owners can obtain FHA-insured mortgage loans at the market rate of interest and the Department of Housing and Urban Development subsidizes interest assistance payment in an amount not exceeding the difference between payments for principal and interest on a mortgage bearing interest at 1%, and payments for principal, interest and mortgage insurance premium on a mortgage with interest at the FHA market rate. See HUD Program Guide, "Rental and Cooperative Housing for Lower Income Families", September, 1971.

A "basic rental" is charged the tenant which is determined on the basis of the private owner's operation of the project under a mortgage bearing annual interest at the rate of one per cent. The rent paid by an occupant is the greater of the "basic rent" and 25 per cent of the tenant's income. 12 U.S.C. § 1715z–1(f); 24 C.F.R. § 236.55(1), (b).

The Housing Act of 1968 will be better understood in its relation to this litigation when viewed against the setting of Mrs. Winningham's own case.

### IV. *Resume of Facts*

The evidence before this Court presents a case that elicits sympathy for Mrs. Winningham.

She was married around 1948 to a soldier named Newman. They were divorced about eight years ago. The five children of the marriage have been in her custody since that time. They are between 11 and 16 years of age.[3] The mother received until recently $50.00 per month support for each child in the form of an allotment deducted by the Army from Newman's pay. Their father contributes nothing to Mrs. Winningham's support.

In December, 1973 Newman was discharged from the Army for failure to pay debts. The child allotments ceased on February 1, 1974. Plaintiff had also been receiving Aid to Dependent Children benefits totalling $23.00 per month. These payments will increase to $183.00 when the pending application is processed by H.E.W.

In 1972 Mrs. Newman married William Winningham. They were divorced last November. Her second husband was a truck operator with yearly earnings of around $6,500. Winningham who lives in South Carolina pays no alimony.

---

3. The oldest son who is a school dropout has recently gone to live with his father in El Paso.

Plaintiff has not been able to work because of her domestic responsibilities. She has no training for any job. Her health is bad. She is unable to make payments on the furniture she and her second husband purchased. Her total indebtedness amounts to nearly $3,000. Living expenses include $61 per month for food stamps; $40 for additional food and sundries she cannot purchase with food stamps; $10 she pays to a neighbor who takes her around in her car and permits use of her phone; $20 for laundry, and $15 per month for clothing for the children. All of these expenses, plus rent, must come out of the children's welfare payments amounting to $183 per month.

The Winninghams moved into Presidential Plaza in December, 1972. The "fair market" rental charge of the unit was $161.69 and the basic monthly rental of $116.46.[4] The lease expired at the end of one year. Plaintiff and her children have continued in the unit. The monthly rent was increased to $129.00 per month on January 1st. Payment of basic rent is impossible under her straitened circumstances. Mrs. Winningham applied for the rent supplement. Were she eligible to receive same, the rental of the unit would be, as earlier noted, only $37.00 per month. Her application for supplemental rent was denied by the Project owner and she was notified to vacate the apartment by January 1, 1974. Letter of December 1, 1973, Gov't.Ex.No.2. There is testimony that Mrs. Winningham was informed that her income is too low to pay the basic rent and that she would have to vacate the apartment.[5]

Plaintiff was a tenant for four years in the Fred Wessels Project in Savannah. The lowest rental in such a public housing facility is $45.00 per month. There are no openings for such housing at present. The evidence at the hearing and affidavits subsequently filed by plaintiff indicate that the rental value of a standard three bedroom apartment or house in Savannah would run between $125.00 and $150.00 per month without cost of utilities. Any apartment costing less would not be up to housing code standards, according to one of the affidavits.

It is clear that Mrs. Winningham cannot afford to pay anything but a very nominal rent.

### V. *Three Judge Court and Class Feature*

This Court denied the application for a temporary restraining order. By its direction, Mrs. Winningham paid the January rent into the Registry of the Court. I declined to take immediate steps to constitute a three-judge district court under 28 U.S.C. § 2282. A hearing was held on January 9th. Several witnesses testified. Affidavits supplementing parts of the testimony have been subsequently filed by plaintiff. Additional evidence in the case does not appear necessary even if a three-judge court should sit.

■■■ Such a tribunal will not have to be convened under the turn the litigation has taken. Plaintiff has by amendment withdrawn her prayer for injunctive relief. She now seeks only a declaratory judgment as to the validity of the statute in its application to her and her class. A three-judge court is not required for the grant of declaratory judgments. Sellers v. Regents of the University of California, 432 F.2d 493, 498 (9th Cir.). Where a complaint does not seek injunctive relief, such a court is not

---

4. Fair market rent is determined on the basis of the monthly principal and interest payments the mortgagor is obligated to make under the mortgage rather than the 1 per cent subsidized interest rate in § 236 projects. See 12 U.S.C. § 1715z–1.

5. Plaintiff has recently filed an affidavit claiming that if she moves, she will have to pay from $200 to $300 rent deposit, etc.; lose her only mode of transportation; be forced to transfer children with learning problems to another school, and that the hardship and strain of moving will further aggravate her nervous condition.

required merely because the validity of a federal statute is drawn in question. School Board of Okaloosa County v. Richardson, *supra,* 332 F.Supp. at 1265–1266.

Decision on the constitutionality of a statute is to be avoided where it is not absolutely necessary to a decision. Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482; Alexander v. Louisiana, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536. In the present litigation there are routes the Court could conceivably take that lead elsewhere than to the Due Process issue. Besides the jurisdictional problem, they include the possibility of mootness of the case when Mrs. Winningham vacates the apartment. There is the matter of plaintiff's standing to sue in view of the fact that her lease has expired and she is now holding over as a tenant. I am advised that recently Mrs. Winningham paid the February rent but not the difference between the former basic rent and the new figure.

Another issue raised by defendants is the fact that $10,000 was allocated or appropriated in September, 1973, as total rent supplement payments for tenants in Presidential Plaza during the ensuing year. If that is the maximum permitted by the contract and by the law, the grant of rent assistance to plaintiff at this time might be precluded.

Whatever merit or relevance such considerations may possess, they must be viewed against this Court's finding that this suit is properly maintainable as a class action under Rule 23(a, b). The class represented by her is designated as § 236 tenants similarly situated to plaintiff's family as to income and need for rent assistance and residing in that type of housing in Georgia.[6] So considered, Mrs. Winningham's lack of right to individual relief does not determine the rights of members of the class she represents. Huff, etc. v. N. D. Cass Company of Alabama, 468 F.2d 172; en banc, 485 F.2d 710 (5th Cir.); Bradley v. Southern Pacific Company, Inc., 486 F.2d 516 (5th Cir.); Smith v. Delta Air Lines, Inc., 486 F.2d 512 (5th Cir.).

## VI. *Section 236 and Pursuant Regulations*

A "qualified tenant" for additional rent benefits under the Act of 1968 is an individual or family who, in accordance with criteria established by the Secretary of HUD, has an income below the maximum amount for occupancy in public housing dwellings and who come within described categories of tenants eligible therefor. As noted, the persons eligible for rent supplement include an individual or family "occupying substandard housing". 12 U.S.C. § 1701s(c)(1)(2)(D).

The Regulations define a qualified tenant as an "occupant of substandard housing". 24 C.F.R. § 215.20(4)(iv). According to HUD Handbook (4520.1), to be eligible for rent supplement one "must now be living in substandard housing". Other classes of tenants qualified for supplemental rent include persons displaced by governmental action; persons sixty-two years of age or older; physically handicapped persons, and families whose head is a member of the Armed Forces on active duty. 12 U.S.C. § 1701s(c)(2).

To qualify for rent supplement the annual income of the individual or family

---

6. I must confess my misgivings as to this being a proper case for class treatment. There is no showing that the class is so numerous that joinder is impractical. See Committee to Free the Fort Dix 38 v. Collins, 429 F.2d 807, 812 (3rd Cir.). No tenants residing in Presidential Plaza are presently receiving rent supplement by reason of having lived in substandard housing prior to being admitted to the Project. All tenants qualify for rent supplement either because they are elderly or because the household head or spouse is physically handicapped. This Court is in the dark as to what the situation may be in such housing projects elsewhere in Georgia. However, the Government has not challenged the class action feature of this case.

must be below the maximum amount in the area for occupancy in a low-rent public housing project. For assisted admission to a Section 236 project the family must have an adjusted income no greater than 135 per cent of the limits prescribed for eligibility for public housing. HUD Handbook, Rental Housing for Lower Income Families (Section 236), FHA 4442 and HUD Circular HM No. 4442.18.[7]

"Income" means total gross income before taxes of all members of tenant's household. Income includes wages and social security benefits. Such income is adjusted by deduction of $300 for each minor in the immediate family whose earnings are not included in the total gross income of the family. Other deductions for limited purposes are allowable. 24 C.F.R. § 215.20(a)(1)(b); § 215.45(a)(b).

The amount of rent supplement paid for tenants qualifying therefor may not exceed that by which the basic rental of the unit exceeds one-fourth of the tenant's income as determined by procedures and regulations established by the Secretary. 12 U.S.C. § 1701s(d). Under the Regulations, the rent supplement payment is that amount by which the rent approved by the Commissioner for the unit exceeds one-fourth of the tenant's income. 24 C.F.R. § 215.45(a).[8] Computation of the amount of basic rent is illustrated in Mandina v. Lynn, 357 F.Supp. 269, 275–276 (W.D.Mo.). The amount of the subsidy cannot exceed 70 per cent of the approved rent for the unit. 24 C.F.R. § 215.25(a).

The contract between the project owner and HUD must state the maximum dollar amount of the rent supplement payment for any one year, including a 10 per cent contingency allowance. 24 C.F.R. § 215.40.

"Substandard housing" is defined by the Regulations as a unit which is "dilapidated" or which does not have within same either "hot and cold piped water" or "flush toilet" or "bathtub or shower" for exclusive use of the occupants. A unit is "dilapidated" when it does not provide "safe and adequate shelter" and "endangers the health, safety or well-being of the occupants" or when the accommodations possess either "critical defects" or "intermediate defects" in sufficient number to require "considerable repair or rebuilding". 24 C.F.R. § 215.-1(d). In determining whether a dwelling occupied by an applicant is substandard, inspection is not made by the housing owner or managing agent but by some agency qualified in the particular field. HUD "Rent Supplement Fiscal Handbook", 4520.2 (1973).

The rent assistance paid to the project owner for qualified tenants is limited to 20 per cent of the total dwelling units but it may be increased to 40 per cent should the Secretary conclude that an increase is necessary or desirable in order to provide housing for qualified tenants. 12 U.S.C. § 1701s(h)(1)(D).

Under present HUD policy and as is reflected by the evidence, decisions as to qualification for rent supplement benefits are made by the project owner and its managing agent. They are reviewed by HUD for accuracy and completeness. HUD Handbook HM 4475.67 (August 7, 1972).

## VII. *The Legislative History of § 236*

Does limitation by Congress of rent assistance to tenants who occupy sub-

---

7. A three-judge district court in California has held that this mandatory income requirement is unenforceable since it renders ineligible for Section 236 housing "the very families Congress mandated a preference". See 12 U.S.C. § 1715z–1(i)(2). The Rent Supplement law sets *"no minimum level of income"*. See Findrilakis et al. v. Secretary of the Department of Housing and Urban Development, 357 F.Supp. 547, 553.

8. The Commissioner may grant a temporary increase in rent supplement payments when "a tenant's income has decreased due to illness, loss of job, or other hardship beyond his control." 24 C.F.R. § 215.60. However, such authority is obviously confined to cases where the tenant is eligible for and receiving rent supplement assistance.

standard housing constitute a denial of equal protection to those who may be similarly situated as to family income but do not reside in such housing? The answer requires inquiry into the legislative history of the eligibility qualification in question.

The rent supplement program was created under the Housing and Urban Development Act of 1965. It applied to tenants of public housing. The Report of the House Committee on Banking and Currency stated that Section 101 of the bill extended rent supplement to "lower income families who are elderly or handicapped, who are displaced from their homes by public action, or who are occupants of substandard housing". Such payments could be made on behalf of "any individual or family unable to obtain standard privately owned housing in his community at a rental which is equal to or less than one-quarter of his income and who is either displaced by government action, elderly or physically handicapped, or occupying substandard housing". According to the House Committee Report, "almost 8 million American families . . . still live in substandard housing"; many within an income range depriving them of ability to afford decent housing. It is this "group to which the proposed new program is directed". The Bill "will help provide", it was predicted, "decent, safe and sanitary housing for thousands of families presently unable to afford anything but substandard housing". President Johnson in his message on housing stated: "The most crucial new instrument in our effort to improve the American city is the rent supplement." See House Report No. 365, 2 U.S.Code Congressional and Administrative News (1965), pp. 2617–2619.

■ The Report of the Committee on Banking and Currency in 1968 discussed the rent supplement phase of the Housing and Urban Development Act of that year but did not deal specifically with the eligibility requirements. See 2 U.S.Code Congressional and Administrative News (1968), pp. 2898, 2992–2993; also Conference Report, *ibid.*, pp. 3053, 3055.[9] For the purpose of this case, the legislative history of § 236 is not enlightening. The qualifications for rent supplement under that Act and those established in the case of public housing in 1965 are the same. Section 236 was designed to provide the same rent assistance to the same groups eligible therefor under the public housing legislation. The Congressional intent was to make it possible for low income families occupying substandard housing and low income elderly and disabled persons to afford the additional cost of renting standard housing. The Committee felt that the rent supplement program "has demonstrated that it is a strong and flexible instrument emphasizing private ownership, private financing, and private management." p. 2898.

### VIII. *Equal Protection*

■ While the Fifth Amendment contains no equal protection clause, it forbids discrimination which is "so unjustifiable as to be violative of due process". Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884; United States Department of Agriculture v. Moreno, 413 U.S. 528, 533 n. 5, 93 S.Ct. 2821, 37 L.Ed.2d 782.

■ The "concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." Reynolds v. Sims, 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506. It does not permit legislation that accords different treatment to persons classified on the basis of criteria wholly unrelated to the objective of the statute. Reed v. Reed, 404 U.S. 71, 75–76, 92 S. Ct. 251, 30 L.Ed.2d 225.

9. In Findrilakis v. Secretary of Department of Housing and Urban Development, *supra*, at 549–550, the three-judge court discussed the legislative history of § 236 but its review was focused on the dominant concern of Congress with tenants of low income as distinguished from tenants of moderate income.

In Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L. Ed.2d 1435, the Supreme Court said, ". . . when we deal with a withholding of a noncontractual benefit under a social welfare program such as this, we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." The interest of a Social Security claimant is protected by the due process clause from arbitrary governmental action but such benefits do not have the protection of accrued property rights. The social security system "is a child of Congress and, as such, subject to its regulation". Randolph v. United States, 274 F.Supp. 200, 203 (M.D.N.C.), aff'd 389 U.S. 570, 88 S.Ct. 695, 19 L.Ed.2d 785. "A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is 'rationally based and free from invidious discrimination.'" Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L. Ed.2d 231; Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491.

"To characterize an act of Congress as conferring a 'public benefit' does not, of course, immunize it from scrutiny under the Fifth Amendment." Richardson v. Belcher, *supra*. However, the Constitution does not leave Government "an unrestricted range when it engages in doling out public funds." De Rodulfa v. United States, 149 U.S.App. D.C. 154, 461 F.2d 1240, 1256. "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket." Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L. Ed.2d 285. In drawing the line between eligibility and non-eligibility Congress does not have to use slide rules or calipers.

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S. Ct. 337, 340, 55 L.Ed. 369. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific'. Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730."

Dandridge v. Williams, *supra*, 397 U. S. 485, 90 S.Ct. 1161.

Counsel distinguishes *Dandridge* on the basis that it involved different classes differently treated while the present case concerns two classes of "indistinguishable people", one of which is entitled to rent assistance and the other is ineligible.[10]

Plaintiff stresses the two 1973 rulings of the Supreme Court in the Food Stamp cases—United States Department of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 and United States Department of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782. *Murry* involved the validity of a provision of the Act making ineligible for stamps any household includ-

10. "Throughout these proceedings, plaintiff has shown that she is indistinguishable from other residents of rent supplement projects who are entitled to receive rent benefits. These identical people are those who presently receive rent supplement because they used to live in substandard housing. They receive rent supplement now for one reason —to enable them to continue living in standard housing. . . . Mrs. Winningham is in the exact same position. She can continue to live in standard housing only if she receives rent supplement at her present residence. But even though these groups are indistinguishable in their need for rent supplement, one group obtains full assistance and plaintiff and others like her are ineligible." See plaintiff's brief, pp. 2–3.

ing a person over eighteen who has been claimed as a dependent for tax purposes by one himself ineligible for the benefits. In *Moreno* the plaintiffs attacked the exclusion from participation of households containing one who is unrelated to any other member. The apparent object of Congress was to make ineligible for receipt of food stamps sons and daughters of more affluent families and also members of "hippy communes". The Supreme Court struck down the eligibility barrier in each case. In *Murry* due process was held to be violated by the irrebutable legislative presumption as to the need of a child with a tax-deducting parent, that fact not being a rational measurement of his or her necessities. In *Moreno* the legislative classification as to "unrelated" persons was said to constitute an irrational classification in violation of the equal protection component of the Due Process Clause of the Fifth Amendment.[11]

There is no question that *Murry* anematized some of the professions of the Court in *Dandridge,* Flemming v. Nestor and Richardson v. Belcher and other welfare cases. In the dissenting opinion in *Moreno* (413 U.S. 545–546, 93 S.Ct. 2831) it was said:

"The Court's opinion would make a very persuasive congressional committee report arguing against the adoption of the limitation in question. Undoubtedly Congress attacked the problem with a rather blunt instrument, and just as undoubtedly persuasive arguments may be made that what we conceive to be its purpose will not be significantly advanced by the enactment of the limitation. But questions such as this are for Congress, rather than for this Court. . . . "[12]

The late Mr. Justice Harlan once asserted what amounts to the power of courts to fill in gaps in acts passed by Congress. In concurring in the result in Welsh v. United States, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 the Justice said:

"Where a statute is defective because of under-inclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." [13]

As Mr. Justice Holmes observed, courts "legislate" but they do it "interstitially". Interpretation is a form of legislation. I am not aware, however, that Article III of the Constitution confers the power on federal courts, by what amounts to judicial legislation, to correct the shortcomings and asperities of statutes.

## IX. *Equal Protection as Applied to this Case*

In the brief filed on behalf of Mrs. Winningham, it is complained that counsel for the Government groups her in the class of existing occupants of substandard housing rather than in the one

---

11. For the three-judge court decisions in *Murry* and *Moreno*, see, respectively, 348 F. Supp. 242 (D.D.C.) and 345 F.Supp. 310 (D.D.C.).

12. The two minority justices said in O'Brien v. Skinner, 414 U.S. 524, 94 S.Ct. 740, 38 L. Ed.2d 702, as respects a state voting provision: " . . . we are confronted with a claim, fashionable of late, that a state statute which . . . because of its failure to provide particular persons particular relief, as here, is an unconstitutional deprivation of the right to vote. And once again the Court strikes down the state statute."

13. The cases cited in support of the dictum are not persuasive. In *Welsh* the majority of the Court did not adopt this concept of statutory construction. It interpreted the section of the Military Selective Service Act of 1967, 50 U.S.C.App. § 456(j) which excludes those opposed to war by reason of religious training and belief as including draftees "whose consciences, spurred by deeply held moral, ethical or religious beliefs would give them no rest or peace if they allowed themselves to become a part of an instrument of war."

to which she properly belongs, namely, similarly-situated tenants residing in § 236 housing and who *are* receiving rent supplement. If a family circumstanced as plaintiff's is has previously resided in substandard housing, it is eligible for rent assistance. Yet with the same income, family size, job and marital status, Mrs. Winningham does not qualify for rent assistance merely because she has not previously lived in substandard housing though denial thereof may force her to do so. Her needs being identical, her rights are the same. Such is her contention.

As framed by plaintiff's counsel, the constitutional issue is: The statutory criteria designed to identify families needing rent supplement is not a sufficiently accurate means of identification of those who come within the broad purposes of the statute. The aim is to provide decent housing for those who cannot otherwise afford same. The legislative purpose is implemented by the statute in such a way that rent assistan̄ denied to her. Plaintiff contends .. Congress established a "classification which denies similar treatment to all persons similarly situated and is, on its face and by its operation . . . grossly unfair." Murry v. U. S. Department of Agriculture, 348 F.Supp. 243. Counsel argue that the Government has shown no "appropriate governmental interest suitably furthered by the differential treatment". See Police Department of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212.

The Food Stamp Act cases are differentiable both as to rationality of classification and relationship to a legitimate governmental interest. *Murry* and *Moreno* involved purposeful, specific denial of welfare to a group which was just as necessitous as those statutorily qualified for food stamps.[14] In the present case there is a mere failure to include a sub-group in the specified, general class qualified for rent assistance. The distinction between deliberate statutory exclusion and non-inclusion of a sub-group as beneficiaries of a welfare program may be subtle but it is relevant to whether the classification is offensively discriminatory. The Rent Supplement statutes created no invidious distinction. They effectuated and constituted the very purpose of the legislation statute.

Mrs. Winningham's counsel argue that the basic objective of Rent Supplement is to provide decent housing for all families of low income and that there can be no rational distinction between those living in substandard housing and those residing in public housing who would be relegated to the former without the aid of rent supplement. Congress fixed an optimistic goal in the 1949 and the subsequent housing acts. Ultimate objectives are not the yardstick, however, of the reach and scope of implementing legislation. The goal may be broader than the immediate means of achieving same. "[T]he law need not be in every respect logically consistent with its aims to be constitutional." Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563. What matters here is not hoped-for goals but the specific legislative steps taken by Congress in the direction of the ultimate object.

At the time the Housing and Urban Development Act was enacted in 1968 that body was quite aware that its program had fallen considerably short of the goal of housing legislation. The House Committee reported that there were "approximately 6 million families who still live in substandard housing". 2 U.S.Code and Administrative News (1968), House Report No. 1585, p. 2873. It is obvious that Congress was deeply concerned about the improvement of the living conditions of families then resid-

---

14. A "congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest". *Moreno*, 413 U.S. at 534, 93 S.Ct. at 2826. See also the three-judge decision in that case (345 F.Supp. 314, note 11) and Williams v. Wohlgemuth, 366 F.Supp. 541, 547 (W.D.Pa.).

ing in substandard housing. But the rent supplement statutes were not enacted to provide assistance to every disadvantaged family. The legislation was restricted to various broad classes of low-income individuals and families—the elderly, the physically handicapped, those displaced by governmental action and families "occupying substandard housing".

Mrs. Winningham comes within none of the statutory groups entitled to rent assistance under the law. Congress could have made the supplement available to tenants in § 236 housing who because of change in economic status find themselves no longer able to afford the cost. It did not. Social justice might have been better served had the legislature tailored the law to fit such a case. But the fact that Mrs. Winningham's family may be equally deserving of federal largess does not mandate its dispensation by Congress in her case. The Legislative Branch concerned itself with families moving from substandard to standard housing and was under no constitutional obligation to create and append to the classes eligible for rent assistance a sub-group. "Line drawing is necessary . . . and by the very process of line drawing, someone will be left out or treated differently." Dissenting opinion in O'Brien v. Skinner, *supra*, 414 U.S. 524, 94 S.Ct. 740, 38 L. Ed.2d 702.

Equal Protection does not place a "straitjacket" on legislatures in dealing with problems of the poor and needy. Jefferson v. Hackney, *supra*. Classifications may be illogical, unequal, unscientific and mathematically imper-

fect and still not deny Equal Protection in the area of welfare legislation.[15] Dandridge v. Williams, *supra*.

### X. *Declaratory Judgment and Order of Court*

The definitions of the groups qualified for rent assistance are not discriminatory in the constitutional sense. A valid governmental purpose underlies the difference in treatment of occupants of substandard housing and families residing in standard housing who may be forced into the former by changed economic status. The failure of 12 U.S.C. § 1701s(c)(2) to treat Mrs. Winningham and low-income occupants of substandard housing the same may be unfair but it is not unconstitutional. If the line drawn between the two groups, or between Mrs. Winningham and existing tenants of § 236 projects who receive rent supplement, is unrealistic, the discrimination is neither invidious nor irrational. The non-inclusion of plaintiff and her class in a group qualified for rent supplement does not deny Fifth Amendment rights. Inequality of treatment by a law is not necessarily unequal protection of the law.

Plaintiff is not entitled to the relief sought. The motion of the Federal defendants for summary judgment and the motion of the other defendants to dismiss are granted. The complaint is dismissed as to all defendants.

The Clerk of Court will prepare and present for approval a judgment in accordance with this Order under Rule 58, F.R.Civ.P. See State National Bank of El Paso v. United States, 5th Cir. 1974, 488 F.2d 890.

15. For the reverse side of the medal, see Frank I. Michelman, "In Pursuit of Constitutional Welfare Rights: One View of Rawls' Theory of Justice," 121 Uni. of Pennsylvania Law R. (May, 1973), pp. 962, 966. The author intimates that the Fourteenth Amendment may embody welfare rights, including that of decent shelter. See also Michelman, "Foreword: On Protecting the Poor Through the Fourteenth Amendment," 83 Har.Law R. (Nov., 1969), pp. 7, 14–16. Cf. Samuel Krislov, "The OEO Lawyers Fail to Constitutionalize a Right to Welfare: A Study in the Uses and Limits of the Judicial Process", 58 Minn.Law R. (Dec., 1973), pp. 211–245.