**Janice WINNINGHAM, on behalf of herself and all others similarly situated, Plaintiff-Appellant,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Defendants-Appellees.**

No. 74–1730.

United States Court of Appeals, Fifth Circuit.

May 1, 1975.

Elisabeth M. Youngerman, Savannah, Ga., David F. Walbert, John L. Cromartie, Jr., Atlanta, Ga., for plaintiff-appellant.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Lamar C. Walter, Asst. U. S. Atty., S. D. of Georgia, Savannah, Ga., for defendants-appellees.

William H. Pinson, Jr., Savannah, Ga., for Abbitt Realty Co. & Dorothy Atkinson.

Before THORNBERRY, COLEMAN and ROSENN[*], Circuit Judges.

ROSENN, Circuit Judge:

Mrs. Winningham, a resident of a "section 236" housing project[1] in Savannah, Georgia, applied under the Housing and Urban Development Act of 1965[2] for financial assistance to supplement her rental payments. Section 101 of that Act authorizes rent supplements for tenants moving to a "section 236" project from substandard housing; it does not authorize rent supplements for those, such as Mrs. Winningham, who did not move into a project from substandard housing. Mrs. Winningham's application therefore was denied.[3] Challenging the statute's constitutionality, she instituted a class action for a declaratory judgment in the United States District Court for the Southern District of Georgia. After determining that it had subject matter jurisdiction, the district court upheld the statute. We affirm.

*I. Subject Matter Jurisdiction.*

Mrs. Winningham alleged subject matter jurisdiction in the district court under various statutory provisions.[4] 28 U.S.C. § 1331(a) (1970) (federal question); *id.* § 1337 (action arising under an act of Congress regulating commerce); *id.* § 1361 (action in the nature of mandamus); 5 U.S.C. § 701 et seq. (1970) (review under Administrative Procedure Act). The district court held that, although sections 1331(a) and 1337 did not provide a basis for jurisdiction, section 1361 did. The district court did not rule on the question of jurisdiction under the Administrative Procedure Act.[5] Win-

---

[*] Of the Third Circuit, sitting by designation.

1. This housing project was subsidized under section 236 of the National Housing Act. 12 U.S.C. § 1715z–1 (1970).

2. Housing and Urban Development Act of 1965, § 101, Pub.L. No. 89–117, 79 Stat. 451, as amended, 12 U.S.C. § 1701s (1970). Section 101(c) defines the tenants moving into "section 236" housing who are qualified to receive rent supplements. Section 101(c) provides in pertinent part:

(c) As used in this section, the term "qualified tenant" means any individual or family who has, pursuant to criteria and procedures established by the Secretary, been determined—

(1) to have an income below the maximum amount which can be established in the area, pursuant to the limitations prescribed in sections 1402(2) and 1415(7)(b)(ii) of Title 42, for occupancy in public housing dwellings; and

(2) to be one of the following—

(A) displaced by governmental action;

(B) sixty-two years of age or older (or, in the case of a family to have a head who is, or whose spouse is, sixty-two years of age or over);

(C) physically handicapped (or, in the case of a family, to have a head who is, or whose spouse is, physically handicapped);

(D) occupying substandard housing;

(E) an occupant or former occupant of a dwelling which is (or was) situated in an area determined by the Small Business Administration, subsequent to April 1, 1965, to have been affected by a disaster, and which has been extensively damaged or destroyed as the result of such disaster; or

(F) a family whose head, or spouse, is a member of the Armed Forces of the United States who is serving on active duty.

3. The district court found that Mrs. Winningham has never occupied substandard housing and therefore "is unqualified to receive supplemental rent assistance under the language of the Act." Winningham v. United States Dep't of Housing & Urban Development, 371 F.Supp. 1140, 1143 (S.D.Ga.1974).

4. Mrs. Winningham also alleged that this is an action to redress a deprivation of her civil rights. *See* 28 U.S.C. § 1343(3) (1970). This basis of jurisdiction apparently was abandoned in the district court.

5. We note that the Fifth Circuit rule is not clear with respect to the Administrative Procedure Act as an independent basis of jurisdiction. *See* Young v. United States, 498 F.2d 1211 (5th Cir. 1974). *But see* In re School Bd of Broward County, 475 F.2d 1117

ningham v. United States Dep't of Housing & Urban Development, 371 F.Supp. 1140 (S.D.Ga.1974).

■ We agree that jurisdiction could not have been exercised under the federal question statute.[6] Nor are we persuaded that the district court had subject matter jurisdiction under section 1361. We conclude, however, that section 1337 did constitute an appropriate basis for jurisdiction.

### A. Absence of Jurisdiction Under Section 1361.

■ The legislative history of section 1361 reveals that the statute's construction turns upon traditional mandamus law.[7] As an extraordinary remedy, mandamus is reserved for extraordinary situations. Will v. United States, 389 U.S. 90, 107, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967) (common law writ of mandamus issued by court of appeals vacated); Carter v. Seamans, 411 F.2d 767, 773 (5th Cir. 1969), cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970) (action in nature of mandamus under section 1361 dismissed). It lies only to compel the performance of a legal duty which is free of doubt. State Highway Comm'n v. Volpe, 479 F.2d 1099, 1104 n. 6 (8th Cir. 1973).

This court discussed the federal mandamus statute at some length in Carter v. Seamans, *supra.*

The courts that have construed Section 1361 have uniformly held that its sole function was merely to extend to all district courts the mandamus jurisdiction formerly exercised only by the District Court for the District of Columbia. The same authorities also emphasize that the provision in question did not make any substantive change in the law of mandamus.

\*   \*   \*   \*   \*   \*

It is hornbook law that mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases. Though it is a legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion. Generally speaking, before the writ of mandamus may properly issue three elements must coexist: (1) a clear right in the plaintiff to the relief sought; (2) a clear duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available.

411 F.2d at 773 (footnotes omitted).

■ We do not believe that the defendants herein are under a "clear duty" to declare Mrs. Winningham eligible under the rent supplement program. We recognize that some courts have construed section 1361 liberally where a constitutional duty is asserted. *See* Burnett v. Tolson, 474 F.2d 877, 882 (4th Cir. 1973); National Ass'n of Government Employees v. White, 135 U.S.App.D.C. 290, 418 F.2d 1126, 1129 (1969). We are unaware of any case in which an alleged

---

(5th Cir. 1973); City of Dallas v. Rentzel, 172 F.2d 122 (5th Cir.) (per curiam), cert. denied, 338 U.S. 858, 70 S.Ct. 99, 94 L.Ed. 525 (1949). We need not discuss this issue in view of our conclusion that jurisdiction existed under section 1337.

**6.** Section 1331(a) confers subject matter jurisdiction on the district courts in cases arising out of the Constitution or laws of the United States where the amount in controversy exceeds $10,000. The district court concluded that Mrs. Winningham failed to satisfy the $10,000 jurisdictional requirement. In this connection, the district court found that

> [t]he difference between the rent, with and without the supplement, is $1104.00 annually. On this basis, future annual rentals, reduced to present value, would have to be

paid for over ten years to meet the jurisdictional requirement.

371 F.Supp. at 1143–44. We are not convinced that the district court abused its discretion in rejecting Mrs. Winningham's allegations of jurisdictional amount under this section. *See* Long v. District of Columbia, 152 U.S.App.D.C. 187, 469 F.2d 927, 933 (1972).

**7.** *See* Udall v. Oil Shale Corp., 406 F.2d 759, 765–66 (10th Cir. 1969), rev'd on other grounds, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970); Prairie Band of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364, 367 (10th Cir.), cert. denied, 385 U.S. 831, 87 S.Ct. 70, 17 L.Ed.2d 67 (1966). *See generally* K. Davis, Administrative Law Treatise § 23.10, at 805–06 (Supp. 1970).

constitutional duty has been held sufficiently "clear" to warrant the exercise of mandamus jurisdiction where a specific statutory provision negates that duty.

In the present case, no doubt exists that Mrs. Winningham is ineligible for a rent supplement under section 101(c)(2)(D). The defendants' statutory duty to deny eligibility is clear. Nonetheless, Mrs. Winningham essentially asks this court to find a clear constitutional duty on the part of the defendants to ignore their statutory mandate. This we may not do.

Mrs. Winningham's constitutional claim is grounded in the equal protection component of the due process clause of the fifth amendment. She asserts that, unless she receives a rent supplement, she will be forced to relocate in substandard housing. Therefore, she maintains, no rational basis exists for classifying her differently from those presently residing in substandard housing or from those who moved into "section 236" housing from substandard housing. As we indicate later in our discussion of the merits of this action, the "clarity" of the constitutional duty urged by Mrs. Winningham is not apparent to us. We therefore hold that section 1361 does not provide a jurisdictional basis for this action.

B. *Jurisdiction Under Section 1337.*

We believe that the district court had subject matter jurisdiction under section 1337. This section confers jurisdiction on district courts over certain actions involving commerce.

> The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

28 U.S.C. § 1337 (1970).

Mrs. Winningham's action arises under section 101 of the Housing and Urban Development Act of 1965 which created the rent supplement program. Pub.L. No. 89–117, 79 Stat. 451–454, as amended, 12 U.S.C. § 1701s (1970). She asserts a right to receive rent supplement payments.

> [This] right, if it exists, comes into being from the Federal Act and the effectual enforcement of that right depends on the validity, construction or effect of that statute.

Caulfield v. United States Dep't of Agriculture, 293 F.2d 217, 222 (5th Cir. 1961) (en banc) (dictum), *citing* Gully v. First Nat'l Bank, 299 U.S. 109, 112–14, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Moreover, section 1337 does not require that a minimum amount be in controversy. 293 F.2d at 222 n. 10. Thus subject matter jurisdiction existed in the district court if the Housing and Urban Development Act of 1965 is an "act regulating commerce."

The phrase "act regulating commerce" has been interpreted in more recent years to encompass all acts whose constitutional basis is the commerce clause of the United States Constitution. Murphy v. Colonial Federal Savings & Loan Ass'n, 388 F.2d 609, 614 (2d Cir. 1967); Imm v. Union R.R., 289 F.2d 858, 860 (3d Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 35 (1961). Moreover, "to found jurisdiction upon § 1337, it is not requisite that the commerce clause be the exclusive source of Federal power; it suffices that it be a significant one." 388 F.2d at 615; *see* Moreno v. United States Dep't of Agriculture, 345 F.Supp. 310, 313 (D.D.C.1972) (three-judge court), aff'd, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

We believe a broad construction of section 1337 is both appropriate and desirable. Federal jurisdiction over actions arising under acts of Congress governing the conduct of federal officials is conducive to more uniform decisions by tribunals which have acquired experience and expertise in dealing with national legislation. The mere fortuity that the requisite jurisdictional amount is not present has little bearing on the desirability of federal jurisdiction. Murphy v. Colonial Federal Savings & Loan Ass'n, *supra*, 388 F.2d at 615. When, as here, the constitutionality of a federal statute

administered by a federal agency is attacked, the case for federal jurisdiction is especially compelling.

Even under the liberal construction of section 1337, however, the district court had jurisdiction in the present case only if the commerce clause was a "significant" source of federal power to enact the rent supplement program. We therefore must assess the constitutional underpinnings of the rent supplement program. To do so, we must review the historical background of our national housing legislation.

Congress originally enacted the National Housing Act in 1934. Act of June 27, 1934, ch. 847, 48 Stat. 1246. Subsequent amendments have added new housing programs such as the one authorized by section 236.[8] The rent supplement program, however, is not part of the National Housing Act, but rather was created by section 101 of the Housing and Urban Development Act of 1965.

Were section 101 an amendment to the National Housing Act, we would have less difficulty in classifying it as an act regulating commerce. The Third Circuit recently has held that the "commerce power clearly is a significant source of federal power for the National Housing Act . . . ." *Davis v. Romney*, 490 F.2d 1360, 1365–66 (3d Cir. 1974). Although *Davis* dealt only with sections 221(d)(2) and 235, we believe the court's reasoning applies equally to other sections of the act, including section 236.

Section 101, as amended, authorizes the Secretary of Housing and Urban Development (HUD) to make annual payments to "section 236" housing owners, among others, on behalf of "qualified tenants." 12 U.S.C. §§ 1701s(a), (h)(1)(D), 1715z–1 (1970). Qualified tenants include those meeting certain financial requirements and formerly residing in substandard housing. 12 U.S.C. § 1701s(c)(1), (2)(D) (1970). Rent supplement payments may extend to no more than 20 percent of the dwelling units in a section 236 project. 12 U.S.C. § 1701s(h)(1)(D) (1970). Rent supplementation contracts with housing owners may be entered into by HUD for a period not to exceed 40 years. 12 U.S.C. § 1701s(a) (1970).

One purpose of section 101 clearly was to aid indigent residents of substandard housing, for payments are authorized on their behalf. Nonetheless, we do not believe this was Congress' only purpose. We of course recognize that the rent supplement program is not an independent housing construction program predicated principally on Congress' power to regulate commerce. The legislative history of section 101, however, indicates that the rent supplement program has as one of its purposes the encouragement of new construction. The Senate Report accompanying section 101, for example, acknowledged that the existing low-rent public housing program had "been unable to stimulate the construction of more than 30,000 new low rent units a year." S.Rep.No.378, 89th Cong., 1st Sess., at 5 (1965), U.S.Code Cong. & Admin.News at 2614 (1965). The report therefore recognized a "pressing need" for additional programs such as section 101. *Id.* Thus, section 101 is significantly rooted in the commerce power for much the same reasons as is the National Housing Act which was designed to stimulate the housing construction industry and employment.

We believe the characterization of section 101 as an act regulating commerce is further supported by the intricate relationship between the rent supplement program and other federal housing programs. *Cf.* Marquez v. Hardin, 339 F.Supp. 1364, 1371 (N.D.Cal.1969) (National School Lunch Program "intricately related" to Commodities Distribution Program). The District of Columbia Circuit recently described the section 101 program as "an incentive that is piggybacked onto projects under other programs." Pennsylvania v. Lynn, 501 F.2d 848, 850 (D.C.Cir. 1974). Since section 101 was enacted in 1965, HUD has been

---

**8.** Act of June 27, 1934, ch. 847, tit. II, § 236, as added, Act of Aug. 1, 1968, Pub.L. No. 90–448, tit. II, § 201(a), 82 Stat. 498, 12 U.S.C. § 1715z–1 (1970).

authorized to conclude rent supplementation contracts with owners of housing financed under sections 221(d)(3), 221(d)(5), and 231(c)(3) of the National Housing Act. Housing and Urban Development Act of 1965, § 101(b), (j), 12 U.S.C. § 1701s(b), (h) (1970). An amendment to section 101 subsequently extended the rent supplement program to housing assisted under section 236 of the National Housing Act.[9] We note that Congress consistently has treated the rent supplement program and other national housing legislation as closely interrelated.[10]

We are satisfied that Congress intended in part that section 101 stimulate housing construction and employment. We therefore hold that the commerce clause is a significant source of congressional power underlying the rent supplement program and that section 101 is an act regulating commerce for purposes of subject matter jurisdiction under section 1337.

## II. Constitutional Claims.

The rent supplement program provides financial assistance to six categories of persons meeting specified income requirements and moving into housing financed under certain federal programs. *See* 12 U.S.C. § 1701s (1970); note 1 *supra.* This action challenges the constitutionality of that program insofar as it applies to former residents of substandard housing moving into "section 236" projects. *See* 12 U.S.C. § 1701s(c)(2)(D) (1970).

In December 1972, Mrs. Winningham, her second husband, and Mrs. Winning-

ham's five children by her first husband moved into Presidential Plaza, a "section 236" housing development. Although the "fair market" rent for their apartment was $161.69 per month, the Winninghams were charged only $116.46, the "basic" monthly rent.[11] After taking up residence at Presidential Plaza, a series of misfortunes beset Mrs. Winningham, including a divorce from her second husband and the termination of child support payments from her first husband. These reverses rendered Mrs. Winningham unable to pay even the basic rent, which was raised to $129.00 on January 1, 1974. The district court found that "Mrs. Winningham cannot afford to pay anything but a very nominal rent." 371 F.Supp. at 1146.

Confronted with the prospect of having to move her family out of Presidential Plaza, Mrs. Winningham applied for rent supplement assistance. Such assistance would have reduced her rent to $37.00 per month. Because Mrs. Winningham previously had not occupied substandard housing and because she did not fall within any of the other five categories of eligible recipients, her application for a rent supplement was denied by the project owner.

In the present action, Mrs. Winningham seeks a declaration that she and all others similarly situated[12] are eligible for rent supplement assistance. Mrs. Winningham contends that, if she is denied rent supplement assistance, she will have to move into substandard housing. She therefore claims that the rent supplement program is unconstitutional as applied to her because the statutory dis-

9. Act of Aug. 1, 1968, Pub.L.No.90–448, tit. II, § 201(e)(3), 82 Stat. 502, adding 12 U.S.C. § 1701s(h)(1)(D) (1970).

10. Section 101 itself, as enacted in 1965, not only established the rent supplement program, but also amended the Housing Act of 1949. Housing and Urban Development Act of 1965, § 101(f), (i), amending Housing Act of 1949, ch. 338, tit. I, § 114, 68 Stat. 623. Other portions of the Housing and Urban Development Act of 1965 amend the National Housing Act. *See* Housing and Urban Development Act of 1965, tit. I, § 102; *id.* tit. II.

11. The "basic" rent is determined on the basis of operating the project with payments of principal and the interest under a mortgage bearing annual interest at the rate of one percent. The tenant is charged the greater of the "basic" rent and 25 percent of his monthly income. 12 U.S.C. § 1715z–1(f) (1970); 24 C.F.R. § 236.55(a)(1), (b) (1974).

12. The district court certified the class represented by Mrs. Winningham as those persons of similar income and need for rent assistance who reside in "section 236" housing in Georgia. 371 F.Supp. at 1147.

tinction between "section 236" tenants formerly residing in substandard housing and those such as herself who subsequently will have to locate in substandard housing is not fairly related to the object of the rent supplement program.

■ Mrs. Winningham's action is founded upon the equal protection concepts embodied in the due process clause of the Fifth Amendment. *See* United States Dep't of Agriculture v. Moreno, 413 U.S. 528, 533 n. 5, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Von Stauffenberg v. District Unemployment Compensation Bd., 148 U.S. App.D.C. 104, 459 F.2d 1128, 1130 (1972). We therefore must determine whether the legislative classification here at issue—occupants of substandard housing— "is rationally related to a legitimate governmental interest." United States Dep't of Agriculture v. Moreno, *supra,* 413 U.S. at 533, 93 S.Ct. at 2825.

Our review of the legislative history of the rent supplement statute reveals that the intent of Congress in providing assistance to occupants of substandard housing was at least twofold. First, Congress intended to benefit a class of persons otherwise unable to obtain standard living quarters. The Senate Report accompanying the Housing and Urban Development Act of 1965, section 101 of which created the rent supplement program, stated that the program was designed to "help provide decent, safe, and sanitary housing for thousands of families presently unable to afford anything but substandard housing." S.Rep.No.378, 89th Cong. 1st Sess., at 3 (1965), U.S.Code Cong. & Admin.News at 2614 (1965). Second, Congress hoped to eliminate substandard housing by stimulating construction of standard housing into which present occupants of substandard housing might move with financial assistance. In this regard, the Senate Report agreed with the President's characterization of the rent supplement program as "the most crucial new instrument in our effort to improve the American city." *Id.* The program was intended to replace substandard housing with new construction by "enlisting the experience and resources of private enterprise." *Id.*

■ When Congress provided economic assistance to occupants of substandard housing, it sought to ease the suffering of a group whose plight is particularly acute. Occupants of substandard housing have a present need of assistance substantiated by their immediate condition. Persons such as Mrs. Winningham, on the other hand, face only the possibility of being forced into substandard housing. They may well find suitable accommodations either under other governmental programs or through assistance of friends or relatives. Painful as the situation may be, Congress is not constitutionally obligated to solve all social problems, especially at one time. It may, as it did here, "select one phase of one field and apply a remedy there, neglecting the others." Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955), *quoted in* Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

The legislative classification challenged here also bears a rational relationship to the objective of eliminating substandard housing. Congress sought to assure that the rent supplement program "would help only those families who are truly in need of assistance in obtaining standard housing . . .." S.Rep.No.378, 89th Cong., 1st Sess., at 8 (1965), U.S.Code Cong. & Admin.News at 2614 (1965). By limiting assistance to families who actually reside in substandard housing, Congress assured that each rent supplement grant would reduce by one family the number of persons compelled to live in substandard housing.

■ We recognize that the classification adopted by Congress for eligibility under the rent supplement program may lack social symmetry and may result in occasional unfairness. Moreover, were we in the position of the legislature, we might have structured differently the eligibility limitations written into the statute. Our function, however, is to adjudicate, not to legislate. In the field of

economics and social welfare, a statute is not unconstitutional merely because the classifications it makes are imperfect. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), *quoted in* Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). We are persuaded that the classification challenged here, whatever its drawbacks, is at least rationally related to legitimate congressional objectives. We therefore hold that the statute is not vulnerable to attack on equal protection grounds.

In addition to her equal protection challenge, Mrs. Winningham contends that the rent supplement statute violates traditional notions of due process. Her argument essentially is that the statute unconstitutionally creates the irrebuttable presumption that she is less in need of rent supplement assistance than persons formerly living in substandard housing.

As we pointed out above, the rent supplement program is not designed to assist all persons of low income or in circumstances of "need." Congress has established other programs for the disadvantaged, the dependent, and the disabled. The purpose of the rent supplement program is to eliminate substandard housing by stimulating construction of new low-income housing units which, with financial assistance, residents of substandard housing can afford. Thus, the rent supplement statute does not create a presumption of "need," for the satisfaction of "need" is not the legislative objective.

Mrs. Winningham relies in part on Vlandis v. Kline which invalidated a statutory presumption of fact pertaining to tuition and other fees at a state university. 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). By statute, "residency" or "nonresidency" in Connecticut determined the amount of these fees which a student was obligated to pay. The Supreme Court assumed that residency was a constitutionally valid basis upon which to differentiate between students charged higher and lower fees. How-ever, regardless of an interim change in residency to Connecticut, the statute conclusively presumed a student to be a nonresident throughout his university career if, at the time of his application for admission to the state university, he was a nonresident. The Court held that this irrebuttable presumption violated due process since the presumption was "not necessarily or universally true in fact" and since Connecticut had "reasonable alternative means of making the crucial determination." *Id.* at 452, 93 S.Ct. at 2236.

Mrs. Winningham also relies on United States Department of Agriculture v. Murry which struck down an irrebuttable presumption of fact contained in the Food Stamp Act. 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973). The Supreme Court accepted the criterion of "indigency" as a constitutionally valid basis for determining the eligibility of households for food stamps. The Food Stamp Act, however, contained a provision which conclusively presumed certain households not to be indigent and therefore not to be eligible for food stamps. Lack of indigency for a given year was presumed if an adult member of the household was named as a dependent in the prior taxable year by a member of another household. This presumption operated even if the household was destitute during the year in which it applied for food stamps. The Court held that the presumption violated due process because the status of one member of a household as a tax dependent in a prior year was not a "rational measure" of the entire household's nonindigency during the later year. *Id.* at 514, 93 S.Ct. 2832.

We believe that, unlike the statutes in *Vlandis* and *Murry,* the rent supplement statute does not create a presumption of fact. In *Vlandis* and *Murry* the presumed facts which determined eligibility for a benefit were "residency" and "indigency," respectively. In the present case, residents of substandard housing are eligible for rent supplement assistance. Unlike the presumed facts in

626

*Vlandis* and *Murry,* however, the fact of "residence in substandard housing" is not presumed from other facts. All residents of substandard housing, providing they meet certain income qualifications not challenged here, are eligible for rent supplement assistance on moving into "section 236" housing. Thus "residence in substandard housing" is not a presumed fact at all. Rather, it is a legislative criterion of eligibility which we earlier held to be rationally related to the legitimate objectives of the rent supplement program. Since a presumption of fact does not exist, Mrs. Winningham's due process argument must be rejected.

Affirmed.