**Karl W. HAHN et al., Plaintiffs-Appellants,**

**v.**

**Joseph GOTTLIEB et al., Defendants-Appellees.**

No. 7552.

United States Court of Appeals,
First Circuit.

Aug. 14, 1970.

1244

Samuel Hoar, Boston, Mass., with whom L. Scott Harshbarger, Robert S. Bowditch, Jr., Harrison A. Fitch, and Goodwin, Procter & Hoar, Boston, Mass., were on the brief, for appellants.

Kenneth F. Phillips, Berkeley, Cal., Myron Moskovitz, and David B. Bryson on the brief for National Housing and Development Law Project, amicus curiae.

Robert J. Sherer, Boston, Mass., with whom Joseph D. Cronin and Roche, Carens & DeGiacomo, Boston, Mass., were on the brief, for Joseph Gottlieb, John C. Pappas, and Bertram Druker, appellees.

Morton Hollander, Atty., Dept. of Justice, with whom William D. Ruckelshaus, Asst. Atty. Gen., Herbert F. Travers, Jr., U. S. Atty., Alan S. Rosenthal, and Judith S. Seplowitz, Attys., Dept. of Justice, were on the brief, for John W. Flynn, Boston Regional Director, Federal Housing Administration, appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

In this appeal, we are asked to decide whether tenants in housing subsidized under § 221(d)·(3) of the National Housing Act have the right to an administrative hearing and judicial review when their landlord proposes to increase rents.

Plaintiffs are members of a tenants' association at the Castle Square project in Boston (the project), a development of low-and middle-income housing financed under § 221(d) (3), as amended, 12 U.S.C. § 1715l(d) (3). Defendants Gottlieb and Druker (the landlord) are the current owners of the project. Prior to the expiration of the plaintiffs' leases in July 1969, the landlord filed a proposed monthly rent increase of $28 per apartment with defendant Flynn, Regional Director of the Federal Housing Administration. Plaintiffs sought an opportunity to be heard on the proposed increase; and, when the FHA failed to satisfy their request, they brought suit in the federal district court.

The district court initially granted plaintiffs' prayer for a preliminary injunction, then vacated its order when the FHA agreed to provide a hearing. The hearing was held before a member of the FHA's Boston staff. Several tenants gave graphic evidence concerning construction defects, which plaintiffs maintain were the cause of higher maintenance and operating costs. Plaintiffs also introduced expert evidence designed to show that the landlord could maintain a satisfactory rate of return on his investment with a smaller rent increase. Shortly after the hearing, defendant Flynn notified plaintiffs that he had granted a monthly increase of $22.00 per apartment, $11.00 effective immediately and $11.00 a year hence.

Plaintiffs immediately renewed their prayer for a preliminary injunction, complaining that the FHA had failed to afford them a "full and fair" hearing. However, the district court, reversing its original position, held that plaintiffs had no right to an FHA hearing and no standing to protest agency procedure in court. The court reasoned that under the National Housing Act, the Secretary of Housing and Urban Development (HUD), under whose jurisdiction the FHA falls, has the widest latitude in determining proper procedures; that, absent statutory authority, tenants had no right to be heard; and that plaintiffs had no legally protected interest since the government was acting under a contract to which plaintiffs were not parties.

On appeal, plaintiffs raise two main issues: first, they assert a constitutional right to a hearing, including opportunity to cross-examine adverse witnesses and an agency decision based on a formal record; and second, they claim a right to judicial review of adverse agency action.[1]

### I. *Statutory Scheme*

We begin our consideration of plaintiffs' claims by examining the statute, § 221(d)(3), as amended by the Housing Act of 1961, Public L. 87–70, 75 Stat. 149. The general goal of national housing policy is to provide "a decent home and a suitable living environment for every American family". 42 U.S.C. §§ 1441, 1441a. Section 221(d)(3) seeks to implement this goal by assisting "private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 1715*l* (a). This assistance to the private sector takes two forms. First, the FHA provides insurance on long-term mortgage loans covering up to 90 per cent of the project's cost, thus encouraging private investment in projects which would otherwise be too risky. Second, eligible borrowers can obtain below-market interest rates on FHA-insured loans, thus reducing the rentals necessary to service the landlord's debt obligation.[2] 12 U.S.C. § 1715*l*(d)(5).

---

1. Plaintiffs also attack certain terms in their lease as unconscionable. However, the relief which they sought in their complaint was not agency review, but an order directing the landlord to reform the lease. While we have jurisdiction under 28 U.S.C. § 1361 to compel a federal officer to perform his duty regardless of the amount in controversy, Peoples v. United States Dept. of Agriculture, 427 F.2d 561 (D.C. Cir. Feb. 3, 1970), Byse and Fiocca, Section 1361 of the Mandamus and Venue Act, 81 Harv.L.Rev. 308 (1967), plaintiffs' claim against their landlord must be based on 28 U.S.C. § 1331, which requires a jurisdictional amount of $10,000. Plaintiffs cannot aggregate their claims to meet this amount unless they assert a common and undivided interest. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). In this case, the rights of the plaintiffs "appear to arise only from the status of each as individual lessee of a portion of the project premises." Potrero Hill Community Action Committee v. Housing Authority, 410 F.2d 974, 978 (9th Cir. 1969). Thus we lack jurisdiction to consider plaintiffs' attack on their lease.

2. This is usually accomplished with the cooperation of the Federal National Mortgage Association, which agrees to purchase the mortgage note when construction is completed. Thus the private lender receives normal interest rates until

To administer this two-pronged program, the statute confers broad discretion on the Secretary of HUD. The Secretary is authorized to approve mortgagors and to supervise their operations "under a regulatory agreement or otherwise, as to rents, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section." 12 U.S.C. § 1715*l*(d) (3). Similar discretion is vested in the Secretary concerning eligibility for occupancy, 12 U.S.C. § 1715*l*(d) (3) (iii), construction standards, 12 U.S.C. § 1715*l*(f), terms of amortization, 12 U.S.C. § 1715*l*(d) (6), and consent to the release of the mortgagor, 12 U.S.C. § 1715*l*(e) (2).

Implementing these broad grants of authority, the Secretary has promulgated regulations concerning priorities and income limits for occupancy in § 221(d) (3) projects. 24 C.F.R. § 221.537. The Secretary also regulates the landlord's return on his investment by strictly supervising accounting practices, 24 C.F.R. § 221.531(b), and, in the case of limited distribution mortgagors like defendants Gottlieb and Druker, by setting a six per cent ceiling on return. 24 C.F.R. § 221.532(a). Applications for rent increases must be submitted to the FHA, which takes into account the rental income necessary to maintain a project's economic soundness and "to provide a reasonable return on the investment consistent with providing reasonable rentals to the tenants." 24 C.F.R. § 221.531(c). FHA's agreement with the landlord in this case further provides that rental increases will be approved if necessary to compensate for increases in expense "over which the owners have no effective control".

These regulations illustrate that the success of a § 221(d) (3) project requires a flexible exercise of administrative discretion. The ultimate goal of the program is housing for low and middle income families, but this goal is to be achieved by expanding the range of housing needs which can be met by private enterprise. S.Rep.No.281, 87th Cong., 1st Sess. 3 (1961), To provide low-income housing while maintaining a sound investment requires considerable adaptability. We think Congress recognized this need for adaptability when it authorized the Secretary to regulate mortgagors by individual agreement as well as by general rule. Of course, the need for administrative flexibility does not of itself preclude an agency hearing or judicial review, but we must take care lest we kill the goose in our solicitude for the eggs.[3]

## II.   *Right to a Hearing*

Plaintiffs' initial claim is that they are entitled to a formal hearing before the FHA prior to the approval of any rent increase. This contention finds no support in the text of the National Housing Act. Plaintiffs claim, however, that both the right to a hearing and its procedural characteristics can be derived from the Due Process Clause of the

---

the loan closing, at which point the FNMA purchases the loan and reduces interest rates to three per cent. *See* Fitzpatrick, FHA and FNMA Assistance for Multifamily Housing, 32 Law and Cont. Prob. 439, 448–453 (1967).

3.   This discussion should dispose of any objection to plaintiffs' standing to seek judicial review. Not only do the tenants allege injury in fact in the form of higher rents, but their interest in low-rent housing is "within the zone of interests" protected by the statute. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827,

25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 164, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The private defendants' argument that tenants were not the primary concern of Congress misses the mark; plaintiffs come within the circumference of those who "arguably" can show a protected interest. A.D.P.S.O. v. Camp, *supra*, 397 U.S. at 156, 90 S.Ct. 827. In this respect, they differ from the plaintiffs in Arnold Tours, Inc. v. Camp, 428 F.2d 359 (1st Cir. June 1, 1970), who could produce no evidence whatsoever to indicate that Congress was concerned with protecting their interests.

Fifth Amendment.[4] Broadly speaking, resolution of this claim requires us to balance the interests of the government in the procedure adopted against the citizen's interest in greater safeguards. Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). As an initial step in the weighing process, we must determine "the precise nature of the government function involved as well as of the private interest that has been affected by government action." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); accord, Goldberg v. Kelly, *supra*, 397 U.S. at 263, 90 S.Ct. 1011. Then, since different standards of fairness have traditionally been associated with different types of proceedings, we must examine the nature of the FHA proceedings and the possible burdens and benefits which might flow from the rights asserted by plaintiffs. Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

In this case, as we have seen, the primary role of the government is that of insurer for private investors. The government attempts to regulate its contractual relations with mortgagors in order to advance public welfare, but its freedom to pursue social goals is limited by the need to avoid excessive losses.[5] While the government may have less freedom as an insurer than it does as an employer, *compare* Cafeteria & Restaurant Workers Union v. McElroy, *supra*, 367 U.S. at 896–898, 81 S.Ct. 1743, the government needs considerable procedural flexibility in either case.

The private interest affected, on the other hand, is the interest of low and middle income families in housing they can afford. The government has not, however, undertaken to provide this assistance directly under the § 221(d) (3) program. Instead, the government provides a limited subsidy to private landlords, who then enter an ordinary lease arrangement with eligible tenants. Plaintiffs are not legally "entitled" to low rents in the same sense that the welfare recipient in Goldberg v. Kelly, *supra*, was entitled to basic sustenance under a system of categorical assistance. *Compare* 42 U.S.C. § 602(a) (10); King v. Smith, 392 U.S. 309, 316, 327, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Moreover, the tenant's interest is not directly jeopardized each time the FHA approves a rent increase. The increase may be small, and rent supplement programs are available to those in greatest need. Thus the government action in this case poses a less serious threat to the private interest involved than the termination of welfare benefits in Goldberg v. Kelly, *supra*, which deprived the recipient of the means of existence, or the denial of a security clearance in Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), which meant loss of employment, or the eviction in Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. April 29, 1970), which as a practical matter meant total loss of decent low-rent housing.

---

4. We are satisfied that the Administrative Procedure Act does not apply to this case. Section 4 of the A.P.A., 5 U.S.C. § 553(a), exempts matters relating to public loans, benefits, and contracts from the statutory requirements for rule-making. Section 5 of the A.P.A., 5 U.S.C. § 554, applies only when there is an "adjudication", a term which implies a greater direct impact on individual interests than is true in our case. *See* Gart v. Cole, 263 F.2d 244, 251 (2d Cir.), cert. denied, 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959); *see* text *infra.*

5. The FHA is financed entirely by premiums on mortgage insurance. When a mortgagor fails, the FHA reimburses the mortgagee and takes over the project by assignment or foreclosure until a new purchaser can be found. Klaman, Public/Private Approaches to Urban Mortgage and Housing Problems, 32 Law and Cont.Prob. 250, 263 (1967); Fitzpatrick, *supra* n. 2 at 459–461. Obviously, under such a program, the FHA has a pressing interest in promoting the solvency of its mortgagors.

The proceeding in which plaintiffs seek to assert their interests is basically an informal rate-making process. The landlord who seeks a rent increase submits documentation to the FHA showing his expenses, return on investment, and the like. The FHA staff then examines his proposal in the light of the terms of the regulatory agreement, the broad criteria of the regulations, and current economic conditions. Plaintiffs seek to encumber these negotiations with a formal hearing, the right to cross-examine adverse witnesses, and an impartial decision-maker, who must state the reasons for his decision and the evidence on which he relies. These procedural safeguards are characteristic of adjudicatory proceedings, where the outcome turns on accurate resolution of specific factual disputes. *See, e. g.*, Escalera v. New York City Housing Authority, *supra;* Randell v. Newark Housing Authority, 384 F.2d 151 (3d Cir. 1967), cert. denied, Avent v. Newark Housing Authority, 393 U.S. 870, 89 S.Ct. 158, 21 L.Ed.2d 139 (1968). Such safeguards are not, however, essential in "legislative" proceedings, such as rate-making, where decision depends on broad familiarity with economic conditions. *Cf.* Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 303–305, 53 S.Ct. 350, 77 L.Ed. 796 (1933). As Professor Davis has pointed out, when decision turns on "legislative" rather than "adjudicative" facts, a formal adversary hearing may contribute little or nothing to the agency's understanding of the issues. 1 K. Davis, Administrative Law § 7.02 at 413 (1958).

The distinction between "legislative" and "adjudicative" facts is particularly apt in this case, where it is the tenants rather than the landlord who seek a hearing. The tenants are unlikely to have special familiarity with their landlord's financial condition, the intricacies of project management, or the state of the economy in the surrounding area. Hopefully, the FHA can check the accuracy of the landlord's documentation without their assistance. They may be aware of construction defects in their own living areas, but if, contrary to § 1715*l*(d) (2), a building has been approved which does not conform to applicable standards, there would seem to be limited utility in rehearsing old mistakes each time a rental increase is sought. Of course, tenants' complaints about maintenance and living conditions ought to be heard, but such grievances can be dealt with without requiring a trial-type hearing with each rent increase. Indeed, an effective grievance system should be operable at all times, not merely when the landlord seeks to raise his rents. Thus the elaborate procedural safeguards which plaintiffs demand are unlikely to elicit essential information in the general run of cases.

These procedures would, however, place a significant burden on the relationship between the landlord and the FHA. At present, applications for rent increases are merely one aspect of an on-going relationship between insured and insurer. Plaintiffs would turn these applications into occasions for full-scale review of the relationship, as their conduct in the hearing they have already received illustrates. Such reconsideration may delay economically necessary rent increases and discourage private investors from entering the § 221(d) (3) program at all. Equally important, the project in question contains some 500 tenants, each of whom has the same interest in low-rent housing. As Justice Holmes pointed out in Bi-Metallic Investment Co. v. State Bd. of Equalization, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915):

"Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in a town meeting or an assembly of the whole." Accord, Bowles v. Willingham, 321 U.S. 503, 519, 64 S.Ct. 641, 649, 88 L.Ed. 892 (1944).

■ Applying the constitutionally relevant test, therefore, it seems to us that the government interest in a summary procedure for approving rent increases outweighs the tenants' interest in greater procedural safeguards. The procedures demanded by plaintiffs would place substantial additional burdens on the insurer-insured relationship without necessarily improving the fundamental fairness of the proceedings. We therefore hold that tenants in housing financed under § 221(d) (3) of the National Housing Act are not constitutionally entitled to an administrative hearing on their landlord's proposals for increased rents.

### III. *Judicial Review*

■ This brings us to plaintiffs' second major claim, that they are entitled to judicial review of FHA decisions to grant a rent increase. Since the National Housing Act does not explicitly bar resort to the courts, we address ourselves to the alternate exception to judicial review, recognized in section 10 of the Administrative Procedure Act: whether "agency action is committed to agency discretion by law". 5 U.S.C. § 701(a) (2). In approaching this question, we recognize a strong presumption in favor of review, which is overcome only by "clear and convincing evidence" that Congress intended to cut off review above the agency level. Barlow v. Collins, 397 U.S. at 167, 90 S.Ct. 832; Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 108, 23 S.Ct. 33, 47 L.Ed. 90 (1902). Such evidence may, however, be drawn not only from explicit language, but also from a statute's purpose and design. *Cf.* Switchmen's Union v. National Mediation Board, 320 U.S. 297, 304, 64 S.Ct. 95, 88 L.Ed. 61 (1943); Barlow v. Collins, *supra*, 397 U.S. at 167, 90 S.Ct. 832. In the absence of a clear declaration of Congressional intent, three factors seem to us determinative: first, the appropriateness of the issues raised for review by the courts; second, the need for judicial supervision to safeguard the interests of the plaintiffs; and third, the impact of review on the effectiveness of the agency in carrying out its assigned role. *See* Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion", 82 Harv.L.Rev. 367, 371 (1968).

Looking first to the appropriateness of judicial review, we note that courts are ill-equipped to superintend economic and managerial decisions of the kind involved here. This is not a case which can be resolved by "judicial application of canons of statutory construction." *Compare* Barlow v. Collins, *supra* at 166, 90 S.Ct. at 837. A partial list of the issues raised by plaintiffs either in the FHA hearing or in the court below includes: whether the landlord's increased operating costs were attributable to poor design and construction defects; whether and to what extent costs attributable to such defects should be absorbed by the landlord or passed on to the tenants; whether estimates of the vacancy rate, of commercial occupancy, and of managerial expenses were reasonable; and whether the FHA had properly determined the investment base for computing a reasonable return. Our only guides in answering such questions are the sometimes conflicting statutory goals of increased low-rent housing through private investment and the extremely broad regulatory criteria of maintaining "the economic soundness of the project" while insuring "a reasonable return on the investment consistent with providing reasonable rentals to tenants." 24 C.F.R. § 221.531(c). Under these circumstances, we willingly confess our incapacity to contribute intelligently to the general course of decisions on rents and charges. *Cf.* Panama Canal Co. v. Grace Line Inc., 356 U.S. 309, 317, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Rural Electrification Adm'n v. Northern States Power Co., 373 F.2d 686, 700 (8th Cir.), cert.

denied, 387 U.S. 945, 87 S.Ct. 2079, 18 L.Ed.2d 1332 (1967).

The second consideration, the need for judicial intervention to protect plaintiffs' interest in low-rent housing, is by no means insubstantial. Plaintiffs' choices are limited; their bargaining power generally not strong. But, as we have already noted, plaintiffs' interests are not threatened by every rent increase, and other forms of relief, such as rent supplements, are available. We must, in addition, take into account the kind of program which Congress has erected to meet plaintiffs' needs. The National Housing Act does not provide categorical assistance to those in need of housing, nor does it erect detailed statutory safeguards to protect their interests, such as those provided for persons displaced by urban renewal. *Compare* 42 U.S.C. § 1455(c); Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 441–443 (N.D.Cal.1969); *see also* Merge v. Sharott, 341 F.2d 989 (3d Cir. 1965). Instead Congress has attempted to meet plaintiffs' needs indirectly, by stimulating private investors to supply low-rent housing. Rents in such housing are to be regulated, but only "in such manner as in the opinion of the Secretary will effectuate the purposes of this section." 12 U.S.C. § 1715*l*(d) (3). Given this mechanism, we think plaintiffs' long-run interest may not be well served by a judicially-imposed system of review of all rent increases. Delay, the frictions engendered by the process of litigation, and the possibility—seldom discussed—of landlord appeals from FHA decisions in favor of tenants may lead to higher rentals and ultimately to less participation by private investors.

Turning finally to the impact of review on agency effectiveness, we think that resort to the courts might have a serious adverse impact on the performance of the FHA. Close judicial scrutiny inevitably leads to more formalized decision-making. This result may be tolerable and even desirable in some cases. However, FHA consideration of rent increases can recur as often as leases expire over the life of a forty-year mortgage.[6] To impose the formalities which attend review on all these essentially managerial decisions seems to us inconsistent with the constant Congressional urgings to simplify procedures and expedite work. *E. g.*, H.R.Rep.No.1585, 90th Cong., 2d Sess., 1968 U.S.Code Cong. and Ad.News, p. 2876.

Equally important, such review would discourage the increased involvement of the private sector which is the goal of § 221(d) (3). Landlords such as defendants are already subject to many restraints. Under § 221(d) (3), their plans must be approved and cost ceilings fixed; their rentals must pass agency scrutiny, and the return on their investment is fixed. Moreover, since government is so heavily involved, they may not discriminate in their admissions policy. Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134 (S.D.N.Y.1968). They are by definition attempting to serve displaced families and families of low and moderate income whose background of poverty and dislocation poses unique problems of accommodation. Were judicial review added to the already onerous burdens which the landlord assumes when he contracts with the FHA, the net effect would be to discourage private investment.

6. In this respect, agency approval of a rent increase differs substantially from agency approval of an urban renewal relocation scheme under 42 U.S.C. § 1455(c), which courts have undertaken to review. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1969); Powelton Civic Homeowners' Ass'n v. Department of Housing and Urban Development, 284 F.Supp. 809 (E.D.Pa.1968). The relocation scheme need be approved only once, at the outset of the project's life. Thus judicial review of the scheme is likely to be far less burdensome than repeated judicial review of rent increases.

In sum, it seems to us that the inappropriateness of judicial review, its minimal utility in safeguarding plaintiffs' rights, and its adverse impact on agency operations all provide "clear and convincing evidence" that Congress did not intend courts to supervise FHA rent decisions. We therefore hold that the approval of rents and charges is a "matter committed to agency discretion by law", and thus not subject to judicial review. In so holding, we do not reach the question whether courts may intervene in those rare cases where the FHA has ignored a plain statutory duty, exceeded its jurisdiction, or committed constitutional error. The present case, which at best concerns a failure to give proper weight to all the relevant considerations, plainly falls within the area committed to agency discretion.

Our decision will not, we hope, discourage efforts to develop effective procedures for the airing of tenant grievances. *See, e. g.*, Symposium, Citizen Participation—Challenge to HUD, 2 Urban Lawyer 1, 39 (1970). We have considerable sympathy for the plight of those who must submit to the fiat of a large and sometimes insensitive bureaucracy. We realize that agencies ostensibly dedicated to the public welfare can sometimes become preoccupied with the needs of their immediate clients, thus promoting what one cynic has described as "socialism for the rich and free enterprise for the poor". And we suspect that, the larger the bureaucracy, the more need there is for instituting procedures of communication and participation for those it is intended to serve— as a means of making better decisions in a more tranquil atmosphere. At the same time, we must also recognize that the achievement of a fair and effective housing program is inescapably in legislative and administrative hands. Accommodating procedures for tenant participation to the needs of effective housing management is, we think, primarily a task for Congress and the FHA, not the courts.

Affirmed.