**Mary Alice DEW et al., Plaintiffs,**

**v.**

**McLENDON GARDENS ASSOCIATES, a partnership, et al., Defendants.**

**Civ. A. No. C 75–643 A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

May 16, 1975.

Sidney L. Moore, Jr., Decatur, Ga., for plaintiffs.

Archer D. Smith, III, Atlanta, Ga., for Interfaith and McLendon Gardens.

David H. Flint and Warren O. Wheeler, Atlanta, Ga., for HSI Management and Housing Systems.

Richard Horder, Asst. U. S. Atty., Raymond C. Buday, Jr., HUD Regional Counsel, Atlanta, Ga., for defendants.

## ORDER

JAMES C. HILL, District Judge.

This is an action brought by tenants of the McLendon Gardens Apartments, a complex financed under § 236 of the National Housing Act, as amended, 12 U.S. C. § 1715z–1. The complaint was filed on April 4, 1975, seeking an injunction against an increase in rent effective April 1, 1975; a declaration that the rent increase approved by the Department of Housing and Urban Development (HUD) is void; and a declaration that the procedure currently used by HUD for consideration and decision of applications for rent increase made by private owners of a 236 project are inadequate and unconstitutional.

The plaintiffs are residents of McLendon Gardens and purport to sue on behalf of a class comprising all tenants at the project. Defendant McLendon Gardens, Ltd. is a partnership which owns the apartments; defendants Housing Systems, Inc. and Interfaith, Inc. are general partners in McLendon Gardens Associates; defendant HSI Management, Inc. is the managing agent for the apartments, in addition, Interfaith shares management responsibilities for the apartments; defendant Carla Hills is the Secretary of the United States Department of Housing and Urban Development; and defendant W. A. Hartman is the Area Director for HUD for the State of Georgia.

A motion for a temporary restraining order was filed with the complaint along with the certificate of notice of the motion for the restraining order. The Court denied the TRO after oral arguments were presented on April 4th, and the matter was set down for an evidentiary hearing to determine whether a preliminary injunction should issue. Thereafter the defendants were served and the private defendants have filed responsive pleadings denying the material allegations of the complaint. The time for the federal defendants to answer has not expired but they have moved to dis-

miss for failure to state a claim. Defendants McLendon Gardens, Ltd., Housing Systems, Inc., and HSI Management, Inc. have filed a counterclaim against the plaintiffs.

Prior to the evidentiary hearing, the parties filed briefs setting out their various legal and factual contentions. The preliminary injunction hearing commenced on May 5, 1975, and concluded on May 6th, during which time the Court heard testimony and received documentary evidence. During the course of the hearing the Court suggested that the preliminary injunction hearing be consolidated with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure and to the entry of a final order based on the hearing. Counsel agreed to this procedure, therefore, this order will constitute the final adjudication of the merits of the case, subject to appeal.

In view of the consolidation of the preliminary injunction with the trial on the merits and the resultant speedy resolution of the case, the defendants who filed a counterclaim have had insufficient time for discovery and counsel for these defendants withdraw the counterclaim in open Court without prejudice.

The Court finds that plaintiff's complaint raises three separate legal and factual issues. (1) Plaintiffs' alleged denial of due process in not being given a hearing before HUD approved the rent increases, (2) judicial review of the substance of the rent increase, and (3) allegations that HUD's regulations, 12 C.F.R. § 401.1 et seq. were not complied with fully. In addition, the Court finds that the jurisdictional grounds of the complaint merit discussion.

## I. JURISDICTION.

Jurisdiction of this Court is predicated on various federal statutes, namely: (1) Cases arising out of the Constitution or laws of the United States where the matter in controversy exceeds $10,000 (28 U.S.C. § 1331);[1] (2) actions arising out of the acts of Congress regulating commerce (28 U.S.C. § 1337);[2] (3) right of review under the Federal Administrative Procedure Act by a person aggrieved by agency action (5 U.S.C. § 702);[3] (4) actions in the nature of mandamus to compel an officer or employee of the United States or agency thereof to perform a duty owed to plaintiff (28 U.S.C. § 1361).[4]

█ It is clear to the Court that it has jurisdiction under 28 U.S.C. § 1337. United States v. Emory, 314 U.S. 423, 62 S.Ct. 317, 86 L.Ed. 315 (1941), indicates that the purpose of the National Housing Act is to stimulate the building trades and to increase employment. Courts in other circuits considering questions similar to the issues involved in this action have found that jurisdiction is proper under § 1337. Davis v. Romney, 490 F.2d 1360 (3d Cir. 1974); Mandina v. Lynn, 357 F.Supp. 269 (W. D.Mo.1973). In addition, Judge Freeman of this District has indicated in dictum that § 1337 would be proper grounds for jurisdiction in an action under § 236 of the National Housing Act. Bloodworth v. Oxford Village Townhouses, Inc., 377 F.Supp. 709 (N.D.Ga.1974). Any doubt in this matter appears to

---

1. The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

2. The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

3. A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

4. The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

have been put to rest in this circuit by a recent decision of the Fifth Circuit Court of Appeals. Winningham v. United States Department of Housing and Urban Development, 512 F.2d 617 (5th Cir. 1975). While the holding in *Winningham* pertains to § 101 of the National Housing Act, the Fifth Circuit panel states that the reasoning of Davis v. Romney, *supra*, is applicable to actions arising under § 236.

The Court does not find that it is necessary to rule upon the other jurisdictional grounds. It is noted, however, that in *Winningham* the Fifth Circuit found that the trial judge had not abused his discretion in rejecting plaintiff's allegations of jurisdictional amount under § 1331. The Court also conceded that the Fifth Circuit rule with respect to the Administrative Procedure Act as an independent basis of jurisdiction is not clear. And although the *Winningham* Court rejected jurisdiction under § 1361, there was no claim in *Winningham* that defendants did not comply with the applicable statutes and regulations as there is in the instant case.

## II. FACTS.

The Court makes the following findings of fact as derived from the testimony of witnesses, documentary evidence, and stipulations entered into by counsel in open Court.

1. McLendon Gardens is a ninety unit apartment project located in the City of Atlanta, DeKalb County, Georgia, within this District and owned by McLendon Gardens, Ltd., a Georgia limited partnership whose general partners are Housing Systems, Inc. and Interfaith, Inc. There are a number of limited partner investors who have an equity contribution in the project of at least $250,000. The project is managed jointly by HSI Management, Inc. and Interfaith, Inc.

2. Plaintiffs are tenants at the project.

3. The project was constructed in accordance with § 236 of the National Housing Act, 12 U.S.C.A. § 1715z–1, and there is in effect between the owners and HUD a regulatory agreement which provides, among other things, for federal insurance and subsidy of the mortgage and certain rent subsidy payments in exchange for which the owners subject the project to regulation by HUD regarding approval of the rent level for the project, selection of tenants to occupy units, reports to HUD, restriction on the amount of dividends payable to the equity owners, and other matters.

4. The project was initially closed on or about June 27, 1972, at which time the aforementioned regulatory agreement was executed and the project note was endorsed for mortgage insurance by the authorized agent of the Secretary of HUD, to the extent of loan advances from the mortgagee. Following construction of the project, final closing was conducted on December 31, 1974, at which time the note in the principal amount of $1,540,800 was endorsed for mortgage insurance.

Although the project was not finally closed until December 31, 1974, the project had been occupied to some degree since about March 1974. The testimony of Eugene Bowens, President of defendant Interfaith, Inc., indicated that the occupancy levels at the project for the last half of 1974 were as follows:

| July: | 44% |
|---|---|
| August: | 62% |
| September: | 81% |
| October: | 98% |
| November: | 98% |
| December: | 98% |

5. McLendon Gardens consists of 51 three-bedroom units and 39 four-bedroom units in townhouse arrangement and has central airconditioning. The "basic" rents established for the project were $122 and $126 per month for three and four-bedroom units, respectively. "Market" rents were set at $191 and $198 for three and four-bedroom units, respectively.

6. In November, 1974, Housing Systems, Inc. initiated a request with HUD

to increase the rental charges for the tenants at McLendon Gardens. On December 16, 1974, Interfaith, Inc. was advised that HUD had approved the rent increases. Interfaith officials notified the tenants on December 20th, that there would be meetings on December 21st, to discuss the proposed increase. There followed a series of tenant meetings on the subject, and on January 7, 1975, officials of Interfaith met with tenants at the project and were advised by the tenants and their counsel that the rent increase had been approved in violation of procedural safeguards which had recently theretofore been established by HUD regulations, in that the tenants had no prior notice of the rent increase application before its submission to and approval by HUD. After reviewing these allegations, Interfaith notified the tenants on January 14, 1975, that the rent increase had been cancelled by HUD because of these irregularities. The tenants were advised that the owners would re-file for a rent increase in accordance with the regulations. These HUD regulations were originally promulgated on September 11, 1974, 39 Fed.Reg. 32738 to become effective October 14, 1974, 24 C.F.R. § 401.1, et seq.

7. On or about January 17, 1975, the owners gave notice of intent to apply for a rent increase, and on February 17, 1975, they applied for the rent increase which is under question in this proceeding. In this application the owners sought a basic rent increase from $122.00 to $175 per month for three bedroom units and from $126.00 to $184.00 per month for four bedroom units. The pre-application notice required by § 401.2 of the HUD regulations was posted as required for a period of at least 30 consecutive days prior to the application and the owners took steps to assure that the posted notice remained intact.

8. The application contained the certification required by the HUD rent increase regulations, 24 C.F.R. § 401.-3(a)(2), particularly including the following certifications:

"4. The materials to be submitted in support of the proposed increase were located in a place reasonable (sic) accessible to tenants in the project and that requests by tenants to inspect such materials as provided for in the Notice were honored. [See 24 CFR § 401.3(b)(4)]

"5. There was one comment from a tenant and it was sent directly to HUD. [See 24 CFR § 401.3(b)(5)]

"6. And 'under the penalties and provisions of Title 18, United States Code, Sections 1001 and 1010, the statements contained in this application and its attachments have been examined by me and are true, correct and complete.'" [See 24 CFR § 401.-3(b)(6)]

9. The "Notice to Residents of Intention to File an Application to HUD for an Increase in the Maximum Permissible Rents," as required by 24 C.F.R. § 401.2, contained the following statement:

"All materials that we intend to submit to HUD in support of our application will be available during normal business hours, by appointment only, at INTERFAITH, INC., 881 Peachtree Street, N.E., Suite 117, Atlanta, Georgia, 30309, for a period of 30 days from the date of posting of this Notice for inspection and copying by residents of McLendon Gardens Apartments".

10. A document entitled, "Project Operating Budget (Form 2264–12/71) Compared with Actual Operating Budget (1/75)" was also enclosed with the application. It presents a comparison of the level of operating expenses that was projected in December, 1971, with the level that was seen for 1975. An increase in $77,091 in projected expenses in 1971 to $150,682 for 1975 was estimated, with the major portion of the increase being shown in the categories of electricity expense ($11,000 to $38,000) and payroll ($6,054 to $18,330).

11. The application also presented the mortgagor's "Evaluation of Tenant

Comments with Respect to the Application for a (Rent) Increase . . . " and a "Cash Flow Statement". The former document notes the negative response of the tenants and also refers to the efforts of both tenants and management in advocating lower utility rates before the Georgia Public Service Commission. The latter document is a chart of monthly expenses incurred by the project between March, 1974, and January, 1975. The entries for the electricity expense line item were as follows:

| | |
|---|---|
| March: | $ 0.00 |
| April: | 117.00 |
| May: | 366.09 |
| June: | 943.68 |
| July: | 941.40 |
| August: | 2,001.41 |
| September: | 2,716.10 |
| October: | 2,345.11 |
| November: | 1,412.90 |
| December: | 1,917,98 |
| January: | 2,194.00 |

12. After posting of the notice, a total of six letters were received by the HUD Atlanta Area Office from tenants protesting the proposed rent increase. These letters in the main express general dismay at the increase; however, *none* of the letters contain an expression of protest about the location of the material being submitted in support of the application or about the amounts proposed to be budgeted for electricity or payroll. Furthermore, the letters did not in any way demand an adjudicatory-type hearing.

13. Upon receipt of the application, officials in the HUD Atlanta Area Office reviewed the material submitted. The Court finds that HUD in approving the rent increase by no means rubber stamped or summarily approved the application. A rental computation worksheet was prepared. This document, and the testimony of William Beasley, Director of the HUD Loan Management Branch, indicate that the following reductions were made in the proposed estimated expense line items:

| | Requested by Mortgagor | Allowed by HUD |
|---|---|---|
| Telephone and Telegraph: | $ 1,300 | $ 600 |
| Gas: | 16,200 | 12,000 |
| Office Expense: | 300 | 0 |
| Management: | 11,472 | 8,886 |
| Payroll: | 18,330 | 11,000 |

———◆———

Except for the addition of $414 for Social Security Taxes, no item was increased, nor was any item (including the amount of $38,000 estimated for electricity) reduced except as noted above. Furthermore, in computing the amount of allowable rent increase HUD did not allow credit for the full amount of equity contribution to be considered but based the rent upon an equity of approximately $173,000.

14. The testimony of Mr. Beasley and his associate, Ms. Marti Nelson, showed that in evaluating the rent increase they considered the cash flow chart and the other documents included in the application, the occupancy levels of the project, the rate increases obtained by the Georgia Power Company in December and January, and expense levels at comparable projects. It was also testified that there were 161 FHA-subsidized multi-family projects in Georgia and that it was estimated, based on about two rent increases a year, that the HUD Atlanta Area Office processes as many as 300 rent increases annually.

15. After determining the amount of estimated operating expenses allowable for the coming year, HUD officials cal-

culated a "basic" rent level, following a standard format for such calculations. The first step in the computations is the application of a factor of 3.331% to the "replacement cost" of the project. The Court inquired into the derivation of this factor, and as a result defendants introduced into evidence a HUD "Transmittal" dated November 20, 1974, and designated 4510.1 CHG. The transmittal included various pages to be inserted into an existing HUD Handbook (4510.1 "Rental and Cooperative Housing for Lower-Income Families—Section 236 Basic Instruction"). One of the pages is a chart entitled "Section 236 Rent Formula and 1% Principal and Interest Rates". This chart indicates that the figure of 3.331% reflects the following factors:

—a 40-year mortgage
—a limited dividend mortgagor
—principal and interest at 1%
—90% replacement cost
—equity investment of 10.%
—return on investment ("limited dividend") of 6%

Application of these and other calculations in the instant case yielded an average figure of $180.67 per unit per month as a justifiable basic rent. Mr. Beasley approved a figure of $178.90, since that was all that the mortgagor requested.

16. The Court allowed the introduction of evidence as to the cost elements reflected in the rent increase application for the purpose of determining if HUD's approval of the increase was arbitrary and capricious or otherwise unlawful. HUD's calculations showed that based upon the expenses allowed by HUD and the equity utilized by HUD, that the owners would have been entitled to an increase greater than sought.

17. No cost elements other than those allowed by 12 U.S.C. § 1715z–1(f)(1) are included in the increased rent schedule.

18. The approval of the rent increase was communicated to the mortgagor on February 26, 1975. On February 26, 1975, HUD approved a rent schedule based on the $178.90 figure showing basic rents of $175 and $184 for three and four-bedroom units, respectively. The letter advising of this approval is quoted as follows:

"We are returning for your records a copy of HUD Form 92458, Rental Schedule, dated February 25, 1975. The Rental Schedule is approved as submitted".

It was this letter that was posted at the project. Additionally, according to the testimony of Dick Koontz, a statement of the reasons for the increase was hand-delivered to the project residents.

19. The rent increase was not imposed immediately. Thirty days notice was given. Also, the testimony of Mr. Bowen revealed that the increase is being instituted in phases. The project was able to do this because of the efforts of Interfaith in collecting contributions to ease the impact of the increase.

20. The evidence showed that the project is located 6.7 miles from 881 Peachtree Street where the material submitted in support of the increase was kept. One witness testified that a car trip over that distance took 26 minutes. Another testified that a bus trip over the same distance took 48 minutes and bus fare is $0.15 each way.

### III. DUE PROCESS.

As indicated at the outset of this opinion, plaintiffs contend that they are entitled to prior notice of a proposed rent increase and a full adjudicatory hearing on the rent increase decision. The federal defendants contend that tenants residing in FHA-subsidized projects do not have any due process or statutory right to prior notice of a rent increase. They assert that five circuits have so held. Harlib v. Lynn, 511 F.2d 51 (7th Cir. 1975); Paulsen v. Coachlight Apartments Co., 507 F.2d 401 (6th

Cir. 1975); Peoples Rights Organization v. Bethlehem Associates, 356 F.Supp. 407 (E.D.Pa.1973), aff'd. 487 F.2d 1395 (3d Cir. 1973); Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971); Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970). The Court finds, however, that these cases in the main dealt with the question of whether or not tenants were entitled to full adversary hearings prior to the granting of a rent increase. Only *Hahn* and *Peoples Rights Organization* seems to reject completely that tenants are not entitled to at least some notice and input before a rent increase is approved.

In the absence of any decision from the Fifth Circuit, the Court finds that the tenants in a 236 project are entitled, under the Fifth Amendment, to limited procedural due process safeguards. The Court is constrained to make this finding in light of a prior decision in this district that is supported by a ruling from the Ninth Circuit Court of Appeals. Geneva Towers Tenants Organization v. Federated Mortgage Investors, 504 F.2d 483 (9th Cir. 1974); Bloodworth v. Oxford Village Townhouses, Inc., 377 F.Supp. 709 (N. D.Ga.1974).

In *Bloodworth* Judge Freeman found that there was sufficient federal action to invoke the protection of the Fifth Amendment.

> As discussed above, the involvement of HUD in a Section 236 project is quite extensive, both at the development and construction stages, as well as during the ongoing operation of the project. This involvement places the private mortgagor in the role of an intermediary carrying out the governmental function of providing decent housing to poor families. HUD's supervision and control, moreover, extends to virtually every phase of a Section 236 project's operation, including the approval of all rental or carrying charge increases. (377 F.Supp. at 716)

Judge Freeman next considered whether plaintiffs' interest in not having their carrying charges increased is a constitutionally protected property interest. He stated at page 716–717.

> We feel that it is [a protected property interest]. [Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)] stand for the proposition that a recipient's expectation or need of government benefits may be deserving of due process protection if, and only if, such need or expectation is objectively justifiable.
>
> \*   \*   \*   \*   \*   \*
>
> In the present case, plaintiffs would appear to have an objectively justified expectation, grounded firmly in Section 236, that they will continue to recieve the benefits of low-cost housing. If low-cost housing is not a major purpose of Section 236, then the existence of federal subsidies and supervision of the project, including prior HUD approval of all carrying charge increases, makes no sense whatsoever. Therefore we conclude that a property interest deserving of due process protection exists in this action.

The Ninth Circuit came to the same conclusion in the *Geneva Towers* case which concerned Section 221(d)(3) housing. The Court stated at 504 F.2d at 489–491:

> We think the tenants of § 221(d)(3) housing do have such a claim, and it lies in their expectation, statutorily created, that they will continue to receive the benefits of *low cost* housing.
>
> \*   \*   \*   \*   \*   \*
>
> In short, there can be little doubt that Congress intended to endow those occupying the housing with some form of benefit.
>
> \*   \*   \*   \*   \*   \*
>
> Since entitlement under the *Roth-Sinderman* analysis depends on a right to the specific benefit the deprivation of which is threatened by the government, the next question is what type of benefit did Congress intend to be-

stow upon the tenants . . .. Congress' purpose was, again quite clearly, to provide the tenants with the benefit of low cost housing. The source of the tenants' entitlement is explicit: it lies in the congressionlly stated purpose of providing persons of meager economic means with low-priced housing . . .. The tenants of § 221(d)(3) housing sign leases with the expectation—created by the congressional commands—that rents will be kept as low as economically feasible. Therefore, even more so than with the type of implicit expectations giving rise to property rights in *Sinderman* and [Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)] the tenants of § 221(d)(3) housing have an objectively justifiable right to low cost housing.

In accord with the reasoning of these two cases are Marshall v. Lynn, 162 U. S.App.D.C. 56, 497 F.2d 643 (1973) and Thompson v. Washington, 162 U.S.App. D.C. 39, 497 F.2d 626 (D.C.Cir. 1973).

■ Having reached the conclusion that plaintiff are entitled to some procedural due process rights before approval of a rent increase, the Court now must determine whether or not this includes the right to a full hearing before HUD. The Court has not found any cases which have come to this conclusion. Even those cases which are most lenient to plaintiffs' position have not required a full hearing and in fact they strongly reject such a suggestion. Quoting first from *Geneva Towers*:

"A full-dress hearing is not necessary. The potential for lengthy delay if a hearing precedes a rent increase would be particularly great with such a requirement especially considering the sheer number of tenants involved. Moreover, as we have said, the tenants' contribution is not likely to be as important as, say, that of the welfare recipient in Goldberg v. Kelly [397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287], because of the technical issues which are a part of a rent determination". 504 F.2d 483, 492.

In agreement is Judge Freeman in *Bloodworth:*

"We agree with the First Circuit that such an encumbrance upon the carrying charge increase process would so burden the private landlord as to make a Section 236 project an unattractive investment, and therefore defeat the purposes of Section 236". 377 F.Supp. 709, 718.

Finally, there is Thompson v. Washington, supra:

"Most of the cases which established a due process right to hearing were concerned with *individualized* determinations-suspension or revocation of licenses, termination of statutory benefits to individuals, dispossession of property. In those cases individual hearings, with some oral presentation, were well nigh indispensable to the airing of the critical questions. Where, as here, the issues involved affect a class of citizens, there is a need to impose some limits to keep the proceeding manageable. While it is impossible to anticipate all the issues which could be raised in a rent-increase dispute, tenants are most likely to be concerned with the landlord's costs, level of services, alternative sources of revenue, and tenants' ability to pay increased rent. On these matters, we believe, tenants will have adequate opportunity to express their views if they are afforded a hearing of the type prescribed by the Administrative Procedure Act for rule-making proceedings: an opportunity to make written presentations. We note that an opportunity of this sort has been held to protect the interests of claimants under a variety of circumstances. See e. g., United States v. Florida East Coast Railway, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); FCC v. WJR, 337 U.S. 265, 247–276, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949)". 497 F.2d 626, 640.

The considerations deliberated in these cases are illustrated in the instant case. After hearing two days of testimony on such matters as occupancy levels, utility rate increases, millage rates, property assessments, and budget estimates, this Court is convinced that affording the tenants an adjudicatory hearing would add very little to HUD's review of a proposed rent increase.[5] The considerations involved in a rent increase determination are (as they must be under a program such as Section 236) for the most part financial in nature; such concerns are best handled on paper and not through oral debate and testimony. Further, the Court is greatly concerned about the impact that requiring an adjudicatory hearing would have on the operations of HUD and the sponsors of these subsidized projects.

It was testified that there are over 160 FHA-subsidized multi-family projects in Georgia and that, during the present era of rising operating costs, the HUD Georgia office has been processing about two rent increases a year in connection with these projects. It takes little imagination to conceive of the necessity of a sizable team of hearing examiners continuously engaging in adversary proceedings (with all that such entails) if plaintiffs were granted the right to an adjudicatory hearing. The inevitable result would be considerable delay in processing rent increases and a concomitant adverse effect on the ultimate objective here; the provision of housing for lower income families. It is doubtful that developers would continue to participate in programs such as Section 236 housing if the adjudicatory process is imposed every time an increase in rent is needed. This Court is of the opinion that whatever additional advantages an adjudicatory hearing would provide to the tenants over what is provided in the HUD regulations are far outweighed by the foreseeable consequences for the overall program.

That some tenants might have to move out as a result of a rent increase does not change the holdings in the cases cited above. In most of these cases, the Courts specifically recognized that, given the income level served by these projects, some tenants might indeed have to move out because of the increased cost of leasing their dwelling. However, the Courts also recognized the existence of economic facts and, balancing the interests, held that the interests of all concerned would best be served by allowing the rent determination process to proceed with limited involvement based on an opportunity for the tenants to present written objections. It is doubtful that the interests of the tenants would be served to any greater extent than by the limited participation provided by the HUD regulations. On the other hand, an entitlement to an adversary hearing could result in desperately needed rent increases being significantly delayed, thus impairing the continued financial soundness of the project even perhaps to the extent of resulting in foreclosure.

Therefore, it does not and cannot follow that, because a tenant might be entitled to an adversary hearing in the context of an eviction action, a tenant suffering a rent increase should likewise receive the opportunity for a full-scale hearing. The former (eviction) involves an *individualized* determination with minimal impact on the continued financial stability of the project; the latter involves a large number of people as well as the economic well-being of the project. This important distinction is well-drawn in *Thompson, supra.*

5. At the hearing, the Court allowed a considerable amount of testimony that under normal circumstances would be considered of dubious relevance. However, the Court was frankly interested in seeing what would be involved in either (1) compelling HUD to allow tenants adjudicatory hearings on rent increases, or (2) finding that judicial review is appropriate in rent increase cases.

The Court therefore holds that plaintiffs have sufficient property interest under the Section 236 program to invoke due process, but that they are not entitled to greater participation in the rent increase process than that outlined in the *Bloodworth* and *Geneva Towers* cases and the new HUD regulations. More particularly, they are not entitled to an adjudicatory hearing.

## IV. JUDICIAL REVIEW.

In addition to the due process claim and the attack upon the failure of HUD to proceed according to its regulations, plaintiffs also challenge the substance of the rent increase in that "certain erroneous statements of fact" were made to HUD by the mortgagor and that the rent increase allowed by HUD was in violation of 12 U.S.C. § 1715z–1(f). These assertions pertain to an alleged presumption that the Georgia Power Company would get 100% of the rate increase request that was pending before the Georgia Public Service Commission, the failure of HUD to check with public authorities on the amount of taxes to be charged the owner of McLendon Gardens, and the allowance of a rate of return on equity, on the basis of a fixed formula.

■ Claims of a similar nature were raised in Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970), wherein the First Circuit, after noting (1) the provisions of 5 U.S.C. § 701(a) which operate to preclude judicial review of matters "committed to agency discretion", and (2) the strong presumption of judicial review in absence of a contrary intent by Congress,[6] identified three factors that should be considered in determining whether judicial review is required:

"In the absence of a clear declaration of Congressional intent, three factors

seem to us determinative: first, the appropriateness of the issues raised for review by the courts; second, the need for judicial supervision to safeguard the interests of the plaintiffs; and third, the impact of review on the effectiveness of the agency in carrying out its assigned role. See Saferstein, Nonreviewability: A Functional Analysis of 'Committed to Agency Discretion', 82 Harv.L.Rev. 367, 371 (1968)". 430 F.2d 1243, 1249.

As to the first factor—appropriateness for judicial review—the Court observed that—

" . . . courts are ill-equipped to superintend economic and managerial decisions of the kind involved here . . . "

"A partial list of the issues raised by plaintiffs either in the FHA hearing or in the court below includes: whether the landlord's increased operating costs were attributable to poor design and construction defects; whether and to what extent costs attributable to such defects should be absorbed by the landlord or passed on to the tenants; whether estimates of the vacancy rate, of commercial occupancy, and of managerial expenses were reasonable; and whether the FHA had properly determined the investment base for computing a reasonable return. Our only guides in answering such questions are the sometimes conflicting statutory goals of increased low-rent housing through private investment and the extremely broad regulatory criteria of maintaining 'the economic soundness of the project' while insuring 'a reasonable return on the investment consistent with providing reasonable rentals to tenants.' 24 CFR § 221.531(c). Under these circumstances, we willingly confess our incapacity to contribute intelligently

6. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

on the general course of decisions on rents and charges". 430 F.2d 1243, 1249.

In two days of testimony, this Court had occasion to observe all too clearly what the First Circuit was alluding to in the above paragraph. The matters involved in a rent increase are not the sort of matters that can be evaluated or resolved by the "judicial application of canons of statutory construction." *Hahn*, supra, at 1249. In terms of the APA's preclusion of judicial review over matters "committed to agency discretion", this is a matter to which "there is no law to apply". *Overton Park*, supra, at fn. 10. Rent increases in Section 236 projects, by their nature, involve difficult estimates of future operating expenses tempered by market considerations. Such matters, which are determined more by experience and technical expertise than by application of definitive standards, are better left to the administrative agency established by the Congress for the express purpose of overseeing the operation of projects constructed and operated under such programs as Section 236. It is apparent from the provisions of 12 U.S.C. § 1715z–1(h) that Congress intended that HUD have broad discretion in this area. The facts in the instant case show that, far from exercising a "rubber stamp" approach, the HUD officials who reviewed this increase subjected the application to close scrutiny; indeed, a number of budget items were cut.

The second consideration recognized in *Hahn* was whether there was a need for judicial intervention to protect plaintiffs' interest in low-rent housing. On this point, the Court observed that the Congress has chosen to meet the needs of the tenants indirectly, through stimulating private investors to supply low-rent housing and state that—

"Given this mechanism, we think plaintiffs' long-run interest may not be well served by a judicially-imposed system of review of all rent increases.

Delay, the frictions engendered by the process of litigation, and the possibility—seldom discussed—of landlord appeals from FHA decisions in favor of tenants may lead to higher rentals and ultimately to less participation by private investors". 430 F.2d 1243, 1250.

The evidence presented in the instant case again supports the observations quoted above. The mortgagor here has gone to extraordinary lengths to ease the impact of a rent increase on the tenants, even in the face of financial losses. If this situation (rent increase litigation) in any way becomes the rule, the private participation that is the basis of the Section 236 program will likely diminish.

The third factor cited in *Hahn* involves a determination of the impact of review on agency effectiveness. That Federal Court review of each and every consideration involved in rent increase decisions would have a serious adverse impact on HUD's effectiveness (particularly in connection with the avoidance of foreclosures) is almost self-evident:

"Turning finally to the impact of review on agency effectiveness, we think that resort to the courts might have a serious adverse impact on the performance of the FHA. Close judicial scrutiny inevitably leads to more formalized decision-making. This result may be tolerable and even desirable in some cases. However, FHA consideration of rent increases can recur as often as leases expire over the life of a forty-year mortgage. To impose the formalities which attend review on all these essentially managerial decisions seems to us inconsistent with the constant Congressional urgings to simplify procedures and expedite work. E. g., H.R.Rep.No.1585, 90th Cong., 2d Sess., 1968 U.S.Code Cong. and Ad.News, p. 2876.

\* \* \* \* \* \*

"Were judicial review added to the already onerous burdens which the

landlord assumes when he contracts with FHA, the net effect would be to discourage private investment." 430 F.2d 1243, 1250.

The Court has already alluded to the testimony of Mr. Beasley that the HUD Georgia office processes as many as 300 rent increases a year. Judicial review of the myriad aspects of these determinations would impose a considerable burden not only on HUD but upon the Federal courts. Further, expensive and protracted litigation over such matters as budgeting for payrolls and electricity bills could foreseeably put a mortgagor so deeply in default as to result in foreclosure. To quote again from *Hahn*:

". . . we must take care lest we kill the goose in our solicitude for the eggs". 430 F.2d 1243, 1246.

Equally to the point is the holding in Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971), another case involving a challenge to a rent increase in an FHA-subsidized project. In *Langevin* the Second Circuit held as follows:

"Nevertheless, we reach the same conclusion of nonreviewability as the first Circuit, on the basis of Professor Davis' first 'unless.' Assuming as we do that the FHA's approval constitutes 'agency action' within the broad definition of 5 U.S.C. § 551(13), it would be most unusual for Congress to subject to judicial review discretionary action by an agency in administering a contract which Congress authorized it to make. Other factors tending in the direction of nonreviewability are the managerial nature of the responsibilities confided to the FHA, cf. Ferry v. Udall, 336 F.2d 706

(9th Cir. 1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965), the need for expedition to achieve the Congressional objective, which we have already discussed, and the quantity of appeals that would result if FHA authorizations to increase rents were held reviewable, see Saferstein, supra, 82 Harv.L.Rev. at 384–86, 390–93.

\* \* \* \* \* \*

"We hold only that a mere claim of error, even of gross error, is not enough to escape the second exception in 5 U.S.C. § 701(a)". 447 F.2d 296, 303, 304.

In agreement with the First and Second Circuits on this issue are the Third (Peoples Rights Organization v. Bethlehem Associates, supra) and Seventh (Harlib v. Lynn, supra) Circuits.

This Court likewise holds that plaintiffs are not entitled under either section 236 or the Due Process Clause to judicial review of the decision by HUD to approve the rent increase. The Federal courts are not the place for the resolution of disputes over such matters as estimating electricity usage in an apartment project for the coming year.[7]

In addition, the Court finds that the method of computing the rent increase did not violate the Section 236 statute. 12 U.S.C. § 1715z–1(f). It appears from the rent computation format that the application of the factor 3.331 to the replacement cost of the project is based on (1) a 40-year mortgage, (2) a limited dividend mortgagor, (3) principal and interest at 1%, (4) 90% replacement cost in the case of projects involving limited dividend mortgagors, (5) equity investment of 10%, and (6) a return on investment of 6%. Since all of

---

7. The instant case presents a situation which militates to an even greater extent against judicial review of the substantive details of the decision to approve the rent increase than the circumstances in *Hahn* and the other cases. The plaintiffs here have had all the advantages provided in the recently adopted HUD rent increase procedures.

They had the opportunity to review the data and they had the opportunity to present objections or comments on such matters as the location of the data and the amounts budgeted for electricity and payroll. Yet, none of the letters which were sent or provided to HUD raised in any fashion these matters.

these elements are contemplated by the statute and are factually present in the instant case, this Court does not perceive a violation of the statute.

## V. FAILURE TO COMPLY WITH REGULATIONS.

[6] In their complaint, plaintiffs allege that the defendants failed to comply with that portion of the HUD rent regulation that requires that the material to be submitted to HUD be open to inspection by the tenants at a reasonable location. In this case the materials were located at the office of Interfaith which is located at 881 Peachtree Street. Plaintiffs claim that this location was unreasonable and that the material should have been located at the site of the project.

The evidence does not bear out this contention. There was testimony that Interfaith's office was located 26 minutes from the project by car and 48 minutes by bus. Further, the bus fare involved was only $0.15 each way. The Court observes that any difficulties that a tenant in McLendon Gardens might have encountered in traveling to 881 Peachtree Street was no more than might be encountered in a trip to obtain a renewal of a driver's license or to visit HUD, the State Legislature, Atlanta Stadium, or any other place or institution in Atlanta where citizens might have cause to visit at one time or another.

The regulation could have required that the material be located at the project site. However, in recognition of the fact that many times such records are better assembled and kept at offices where the business of the mortgagor or managing agent is carried on (at which persons might be available to explain the data), HUD opted for a rule of reason. The location of the material does not have to be *absolutely* accessible or *immediately* accessible, just *reasonably* accessible. It appears to this Court that the location was patently reasonable.

■ Although not raised in the complaint, plaintiffs' counsel at the May 6th hearing raised a question concerning compliance with the provisions of the HUD rent increase regulations which indicate that HUD will state the reasons for approving a rent increase in its approval letter and that said letter will be posted at the project for 30 days. (24 CFR § 401.4) It appears that the approval letter in this case did not set out the reason for the rent increase, and that therefore the letter did not strictly comply with § 401.4. The Court, however, finds no basis for relief in this regard. First, it is apparent that the objective of the provisions of § 401.4 is informational only, since there are no further administrative procedures available after the HUD Area Office approves the increase; thus, a notice in the due process sense would not be necessary or meaningful. Secondly, plaintiffs have not shown that they were prejudiced in any way by this error; on the contrary, it seems that the reasons for the increase were well-known, both before and after HUD approval.

## VI. SUMMARY.

In a very real sense, the interests of HUD here are coextensive with the concerns of the tenants of projects such as McLendon Gardens. Under the Section 236 program, when HUD approves an increase in rent, it is in effect approving an increase in Federal financial contributions (i. e., interest reduction payments, see supra) to the project on behalf of the tenants. For example, a tenant who was paying the market rent prior to the increase was not subsidized at all by the Government. If, after the increase, 25% of his income was less than the market rent, the Government would, subject to the basic rent, absorb the difference. Thus, HUD has a financial interest in keeping the rents as low as possible. HUD has an additional interest in avoiding foreclosure, an objective that in particular cases may depend on raising

the rents (and thereby increasing gross income) or in other cases, maintaining or reducing rents (generating demand). These circumstances, inherent in the Section 236 program, combine to provide a substantial safeguard for the tenants. This intrinsic protection, considered with the procedural safeguards of the rent increase regulations, shows that providing the tenants with the opportunity for a full-scale hearing would add little to the rent increase decision process. Whatever additional protection that such would afford tenants is outweighed by the considerations which have been described at length in this opinion.

There are more than 160 FHA-subsidized projects in Georgia, encompassing thousands of units. Rent increases for these projects have been occurring about once or twice a year. To conduct adjudicatory hearings on these decisions would involve a costly and consuming burden; a burden which is unjustified in view of the circumstances described above. Furthermore, judicial review of the details of the rent increase decision on these projects would, if this case is any indication, impose a substantial burden on the courts.

Therefore, the Court concludes:

1. It has jurisdiction under 28 U.S.C. § 1337.

2. Plaintiffs are not entitled to either a preliminary or permanent injunction against the rent increase. The Court declares said rent increase to have been lawful in all respects.

3. The counterclaim of defendants McLendon Gardens, Ltd., Housing Systems, Inc. and HSI Management, Inc. is dismissed without prejudice.

4. The Clerk is directed to enter judgment that the injunction sought be denied and that this action is dismissed.

It is so ordered.